BARBARA J. PARKER, City Attorney – SBN 069722
MARIA BEE, Chief Assistant City Attorney – SBN 167716
DAVID A. PEREDA, Special Counsel – SBN 237982
JAMILAH A. JEFFERSON, Senior Deputy City Attorney – SBN 219027
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-7686; Fax: (510) 238-6500
Email: jjefferson@oaklandcityattorney.org
*X04613/2598988*

Attorneys for Defendant,
CITY OF OAKLAND, et al.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ANITA MIRALLE, JODII LE'GRAND EVERETT, I; TINA SCOTT, AIYAHNNA JOHNSON, LUCAS D. BROWN, IRVIN JOSUE HERNANDEZ ORTEGA

Plaintiff,

v.

THE CITY OF OAKLAND, LIBBY SCHAAF, JOE DEVRIES

Defendants.

Case No. C18-06823-HSG

**THE CITY OF OAKLAND DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: November 26, 2018
Time: 3:00 p.m.
Courtroom: 2, 4th Floor

The Honorable Judge Haywood S. Gilliam, Jr.

# TABLE OF CONTENTS

Page


I. INTRODUCTION ....................4

II. FACTUAL AND PROCEDURAL BACKGROUND ....................5

A. Factual Background ....................5

1. The City's homelessness crisis ....................5

2. The City's encampment policy and procedures ....................6

3. 9418 Edes Avenue and 606 Clara Street ....................9

4. The Village ....................10

5. Illegal entry ....................11

6. City's proposed closure ....................12

7. November 13, 2018 – present ....................12

B. Procedural Background ....................13

III. LEGAL ARGUMENT ....................14

A. Standard of Review ....................14

B. Plaintiffs are not likely to succeed on merits of their claims alleging violations of the Eighth and Fourteenth Amendment ....................15

1. Eighth Amendment ....................15

2. Fourteenth Amendment ....................18

a. The City provides notice of stored property ....................18

b. The City does not burden the right to travel ....................20

C. Plaintiffs will not suffer irreparable harm if the Court does not enter a preliminary injunction ....................22

D. The balance of equities does not tip in favor of the Plaintiffs or the Court entering a preliminary injunction ....................23

E. A preliminary injunction is not in the public's interest ....................24

IV. CONCLUSION ....................24

# TABLE OF AUTHORITIES

Page(s)

## UNITED STATES SUPREME COURT CASES

*Amoco Production Co. v. Village of Gambell, AK,*
480 U.S. 531 (1987) ....14

*Cavanaugh v. Looney,*
248 U.S. 453 (1919) ....15

*City of Cleburne v. Cleburne Living Center,*
473 U.S. 432 (1985) ....21

*Ingraham v. Wright,*
430 U.S. 651 (1997) ....13, 18

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ....14

*Munaf v. Geren,*
553 U.S. 674 (2008) ....14

*Powell v. Texas,*
392 U.S. 514 (1968) ....16

*United States v. James Daniel Good Real Prop.,*
510 U.S. 43 (1993) ....18

*Weinberger v. Romero–Barcelo,*
456 U.S. 305 (1982) ....15

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ....14, 18, 22

## COURT OF APPEALS CASES

*Clement v. City of Glendale,*
518 F.3d 1090 (9th Cir. 2008) ....19

*Jones v. Los Angeles,*
444 F.3d 1118 (9th Cir. 2006) ....16

*Lavan v. City of Los Angeles,*
693 F.3d 1022 (9th Cir. 2012) ....18, 19, 20

*Martin v. City of Boise,*
902 F.3d 1031 (9th Cir. 2018) ....passim

## DISTRICT COURT CASES

*Pottinger v. City of Miami,*
810 F. Supp. 1551 (S.D. Fla. 1992) ....passim

*Sullivan v. City of Berkeley*,
No. C 17-06051 WHA 2017 WL 4922614
(N. D. Cal. Oct. 31, 2017) …………………………………………..17, 18, 20, 23

**LOCAL ORDINANCES**

Oakland Municipal Code section 9.08.160 ……………………………………………..17

# I. INTRODUCTION

Plaintiffs Jodii Le' Grand Everett, I, Tina Scott, Aiyahnna Johnson, Lucas D. Brown, and Irvin Josue Hernandez Ortega broke into and cut a metal lock on a fence surrounding a City-owned parcel of land, formed an unsanctioned homeless encampment, are illegally trespassing on the lot, and refuse to move. Residents in the immediate surrounding area are subjected to the trash, inoperable vehicles, tents, unpermitted structures, and unsafe conditions that the unsanctioned encampment has brought to their residential neighborhood. The unsanctioned encampment is across the street from and a short walk from a preschool, elementary school, senior center, community sports center, and a library. The community's most vulnerable residents are exposed to these conditions and rely upon Defendant City of Oakland leaders to protect their right to and interest in a clean, safe, vibrant, and thriving community.

However, the City must balance the rights and needs of all its residents – the housed and unhoused. The City recognizes its homelessness crisis and has worked and continues to work diligently to provide shelter, medical services, and other resources to Oakland residents who are living on the streets and outdoors. Moreover, the City is not blind to the countless homeless encampments that line City streets. It has developed a policy and procedures that focus on public health and safety to address the growing problem with compassion and sensitivity. The City works with homeless individuals on a daily basis to assist them, at a minimum, in accessing indoor shelter.

Nonetheless, the City's policy and procedures do not condone criminal conduct. All of the actions that Plaintiffs have engaged in to "take over" the parcel at 9418 Edes Avenue are illegal. Before Plaintiffs' trespass, City officials were working with Plaintiffs to identify a suitable location for their encampment. 9418 Edes Avenue was and remains unsuitable for a homeless encampment. The City is not closing this unsanctioned encampment simply because the encampment's residents are homeless and living outdoors. This parcel was fenced off to *all* Oakland residents –housed or unhoused, is in the heart of a residential neighborhood, and is in close proximity to valuable community resources.

Plaintiffs are "standing" their ground and refuse to move or relocate from the City's

fenced parcel. Plaintiffs rely on *Martin v. City of Boise* and related case law to support their resistance to the City's efforts to close the unsanctioned encampment. Their federal complaint, however, is wholly without merit. The City is not violating the civil rights of Plaintiffs or homeless individuals as a class of residents. The City's policy and procedures that address homeless encampments and related conditions preserve the constitutional rights of homeless individuals. There is no legal basis to restrain the City from closing the unsanctioned encampment. The motion for preliminary injunction must be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background.

#### 1. The City's homelessness crisis.

Over the last few years, the City has experienced a 25% increase in its unsheltered population. Declaration of Joe DeVries ("DeVries Decl.") ¶ 4. Across the country, there has been a 40% increase in homeless individuals. DeVries Decl. ¶ 4. The dramatic growth and increase in the number of encampments compelled the City to adjust its traditional approach to addressing these encampments. The City modified its historical approach and developed more comprehensive strategizes to be more responsive to the needs of homeless individuals. DeVries Decl. ¶ 4.

The enhanced strategic approach has focused on expanding shelter options such as adding year-round shelter beds, launching the Community Cabin program (also known as "tuff sheds"), developing more comprehensive homeless prevention programs, and changing day-to-day street encampment management. DeVries Decl. ¶ 4. Specifically, with respect to street encampments, the City developed a policy that provides a variety of responses to address the unique needs of each encampment. DeVries Decl. ¶ 4. The City does not simply rely on its Standard Operating Procedure to close each street encampment after notifying residents of the closure. Instead, over the last year and a half, the City's Encampment Management Team has applied a new methodology, described below, and has dramatically reduced the number of encampment "closures." DeVries Decl. ¶ 4.

For example, in April 2017, City staff presented a report to the City Council that

addressed the entire continuum of care for the homeless and made several recommendations to better address the crisis. DeVries Decl. ¶ 5. The City Council's FY2017-19 budget, which was adopted in June 2017, provides support for these new initiatives. DeVries Decl. ¶ 5. In August 2017, the City created the Encampment Management Team. In September 2017, the City Council reaffirmed its Shelter Crisis Declaration ("Declaration"), which allowed City staff to implement innovative new programming to address the crisis. DeVries Decl. ¶ 5.

Since that Declaration, the City has opened three Community Cabin sites providing emergency shelter and wrap-around services for 240 additional individuals each year, expanded traditional shelter beds by 100, and acquired a new transitional housing facility to provide 90 new beds dedicated to moving homeless individuals off the street and into permanent housing. DeVries Decl. ¶ 6. The City also launched "Keep Oakland Housed," a $9 million prevention program to prevent homelessness by providing up to $7,500 in immediate assistance to individuals who are about to lose their housing. DeVries Decl. ¶ 6.

**2. The City's encampment policy and procedures.**

The City has established and implemented an Encampment Management Policy ("Policy") to clarify and coordinate all aspects of managing homeless encampments in the City. Declaration of Peter Dunlap ("Dunlap Decl.") ¶ 3, Ex. A. The City's Policy balances the interests of both unsheltered residents of Oakland, as well as the rights of other community residents who may be permanently living around these unsheltered individuals. Dunlap Decl. ¶ 4. The City's Policy does not focus on closing encampments. Instead, depending on the particular circumstances of an encampment, the Policy authorizes multiple methods of intervention including: (1) debris pick-up near or in the encampment; (2) temporary health and safety measures that provide services such as barriers against traffic, portable toilets and/or wash stations, and regular garbage pick-up; (3) cleaning that involves temporarily moving an encampment to resolve health and hygiene issues and allowing residents to return; and, finally, (4) closure where the City removes an encampment and uses enforcement to prevent re-encampment. Dunlap Decl. ¶ 5.

The City considers multiple factors including safety, health, location, and size to

determine which level of intervention is warranted for a particular encampment. Dunlap Decl. ¶ 6. For example, the City considers objective health and safety hazards such as proximity to moving traffic or steep slopes, the number of calls for service to emergency responders for criminal and/or fire activity, excessive quantities of trash, uncontrolled presence of needles, human waste, and the presence of vermin. Dunlap Decl. ¶ 6. In addition, the City considers factors such as proximity to community resources such as schools, and health or senior centers, impacts to the existing neighborhood community, damage to public infrastructure, blocking public access such as on sidewalks or in the roadways, and whether the size of the encampment has disproportionate impacts on the surrounding neighborhood or is creating an unsafe environment for those in the encampment. Dunlap Decl. ¶ 7.

The City has organized an interdepartmental Encampment Management Team ("EMT") that includes staff from the City's Public Works, Human Services, City Administrator's Office, Oakland Police Department, Oakland Fire Department, and the City Attorney's Office. Dunlap Decl. ¶ 8. The EMT reviews information about encampments in the City and decides whether and to what extent intervention is necessary. Dunlap Decl. ¶ 8. The EMT also works with Outreach workers who have direct contact with the individuals in the encampments. Dunlap Decl. ¶ 9. One critical function of Outreach workers is to locate and assess the availability of shelters and available housing for individuals in encampments. Prior to any proposed closure, the City's EMT works with the Outreach team to ensure that they have identified available shelter and communicated the details of accessing shelter to the encampment residents. Dunlap Decl. ¶ 9.

If an encampment is identified for closure, the City has a Standard Operating Procedure ("Procedure") that guides its Public Works Department through a safe, legal closure. Dunlap Decl. ¶ 10, Ex. B. Encampment closures are focused on public health and safety. Dunlap Decl. ¶ 10. Closures are designed to remove encampments from the public right-of-way, parks, and other City-owned property. Dunlap Decl. ¶ 10. The Procedure requires Public Works staff to visibly post a 72-hour notice of closure. Dunlap Decl. ¶ 11, Ex. C. The City has also contracted with Operation Dignity – an organization that serves homeless and at risk individuals to meet

immediate and long-term housing needs and provide support services – to post the 72-hour notice in multiple visible locations. Dunlap Decl. ¶ 11.

The 72-hour notice states that Public Works crews will abate the encampment on the date listed in the notice and property remaining at the site after the closure will be stored (or discarded if it is unsafe or hazardous). Dunlap Decl. ¶ 11, Ex.C. In addition, there is a contact number(s) for individuals to call about questions related to the closure. Dunlap Decl. ¶ 11. The City will not enforce an encampment closure without posting a 72-hour notice. Dunlap Decl. ¶ 11. Once the 72-hour time period has expired, Public Works staff members return to close the encampment and remove any belongings that remain at the site. Dunlap Decl. ¶ 12. If necessary, the Oakland Police Department may be available for assistance during a closure. Dunlap Decl. ¶ 12.

During a closure, encampment residents are not prevented from retrieving their belongings – and City personnel will not remove belongings from the site if the resident is present (unless there is a reasonable belief that the belongings pose an immediate public health or safety threat or are evidence of a crime or contraband). Dunlap Decl. ¶ 12. Further, the City's outreach workers go directly to the encampment site to offer shelter beds and resources to individuals prior to the closure and while it is taking place. Outreach workers may also provide transportation to assist individuals with moving their belongings. DeVries Decl. ¶ 27.

The City discards only belongings that are clearly trash or unsafe for storage such as food, soiled items, or items for personal hygiene. Dunlap Decl. ¶ 13, Ex. D. The Oakland Fire Department or Crime Scene Cleaners will dispose of all hazardous materials such as blood, urine, and human waste. Dunlap Decl. ¶ 13. However, all other belongings that are left at an encampment site after closure such as identification, medication, backpacks, tents, and bicycles, are collected, bagged, labeled, and stored. Dunlap Decl. ¶ 13, Ex. D. The City subsequently posts a Notice of Collected Property at the encampment for those who may return for their belongings. Dunlap Decl. ¶ 14, Ex. E. The notice indicates that property was collected and gives contact information for retrieving belongings. In addition, the notice states that "property will be stored for ninety (90) days" from the date listed on the notice. Dunlap Decl. ¶ 14, Ex. E.

**3. 9418 Edes Avenue and 606 Clara Street.**

The City owns parcels of property at 606 Clara Street and 9418 Edes Avenue in Oakland. Dunlap Decl. ¶ 15. The parcels of land are adjacent to each other and border Edes Avenue between Clara Street and Elmhurst Avenue. Dunlap Decl. ¶ 15. The combined parcels are approximately half (.5) acres in size. Dunlap Decl. ¶ 15. The parcel at 9418 Edes Avenue contained a liquor store many years ago and was problematic, an eyesore, and a source of continuing blight and criminal activity in the community. Declaration of Iris Merriouns ("Merriouns Decl.") ¶¶ 5-8; DeVries Decl. ¶ 15; Dunlap Decl. ¶ 16. When the City's Redevelopment Agency acquired the parcels in 2008, it demolished the liquor store and completely cleared the parcel(s). Merriouns Decl. ¶ 8; DeVries Decl. ¶ 15.

In 2009, the City issued a Notice of Development Opportunities for development proposals for the parcel and an adjacent parcel at 606 Clara Street. DeVries Decl. ¶ 16. With the notice for development opportunities, the City hoped to stimulate positive development and continued pride in the local community. DeVries Decl. ¶ 16. The proposal that received the highest rating was for a skilled nursing facility to be built over commercial use space for a pharmacy, clinic, and small grocery store. DeVries Decl. ¶ 16. Regardless of the proposed development, any revenue or disposition proceeds generated by the property are restricted bond proceeds that can only be used for redevelopment purposes consistent with the bond covenants for the Coliseum Redevelopment Project Area Tax Allocation Series 2006 (Taxable) Bond Funds. DeVries Decl. ¶ 18.

The area immediately surrounding the parcels at 9418 Edes Avenue and 606 Clara Street is residential. Dunlap Decl. ¶ 17. Several community resources are located immediately adjacent to or less than a five minute walk from 9418 Edes Avenue including: Oakland Public Library: Brookfield Branch (9255 Edes Avenue); East Oakland Senior Center (9255 Edes Avenue); Brookfield Elementary School (401 Jones Avenue – 0.3 miles from 9418 Edes Avenue); Brookfield Early Childhood Center (401 Jones Avenue – 0.3 miles from 9418 Edes Avenue); and East Oakland Sports Center (9161 Edes Avenue). Dunlap Decl. ¶ 17, Ex. H.

**4. The Village.**

In January 2017 a group calling itself "The Village" led by Plaintiff Anita Miralle took over Grove Shafter Park in North Oakland. DeVries Decl. ¶ 7. The Village deliberately moved homeless people from other locations in West Oakland into the park without any prior notification to the City or the surrounding community. DeVries Decl. ¶ 7. The Village deliberately moved homeless people from other locations in West Oakland into the park without any prior notification to the City or the surrounding community. The group towed RVs into the park area causing significant damage, began erecting wooden structures, tapped into the irrigation system, took over areas designed for recreation, installed multiple wooden pallets with tents on top of them, and hung signage indicating they were ungovernable. DeVries Decl. ¶ 7. City staff contacted Plaintiff Miralle encouraged her to consider working with the City to determine if there was a legal and safe way to create an encampment. DeVries Decl. ¶ 7.

As the Village continued to add structures, the City received complaints from multiple neighbors who were fearful of using the park and concerned about identifiable nuisances including people showering in public and intimidating residents who wished to use the dog park and basketball courts. DeVries Decl. ¶ 8. City staff observed open fires, illegally stored flammables such as propane tanks, structures built several feet high with no regulation and questionable egress, and continued damage to park facilities. DeVries Decl. ¶ 8. As a result, the City posted a 72-hour notice and dismantled the encampment. DeVries Decl. ¶ 9.

After the City posted a 72-hour notice, several advocates approached City staff and demanded more meaningful conversation about how the City addressed encampments. DeVries Decl. ¶ 9. City staff agreed to meet with a group of individuals who eventually became the Homeless Advocacy Working Group ("HAWG"). The HAWG has advocated for a variety of changes to City policies. DeVries Decl. ¶ 9. The City has responded favorably to many changes, including installing sanitary facilities at large encampments, sending case managers out on days that encampments are closed, and limiting the amount of moving that unsheltered persons must do to clean encampment areas. DeVries Decl. ¶ 9.

One core proposal that the HAWG pursued was an area where "the Village" could create a

"managed" encampment. DeVries Decl. ¶ 10. City staff identified a parcel located at East 12th and 23rd Street where a small encampment already existed as a potential site. DeVries Decl. ¶ 10. Ultimately, this site was not suitable. DeVries Decl. ¶ 10-11. At times, it has been difficult to work with the Village because they are often unwilling to cease illegal activities. DeVries Decl. ¶ 10-11. To alleviate this difficulty, the City contacted the Lao Family Community Development Inc. to assist with communications and negotiations between the City and the Village. DeVries Decl. ¶ 11-12.

Through the Lao Family Community Development Inc., the City offered the Village the opportunity to use 1449 Miller Avenue, a site just two blocks from their current encampment to run a "managed" encampment. DeVries Decl. ¶ 12. On Tuesday, October 30, 2018, City staff received approval from the Oakland City Council to enter into a no-cost license agreement with the Lao Family Community Development Inc. for the Miller Avenue Site. DeVries Decl. ¶ 12. Although the City was working diligently with organizers of the Village to identify an appropriate encampment site that provided the Village with a space for its "managed" encampment while protecting the rights and safety of local community residents, the organizers of the Village intentionally and illegally entered City-owned property at 9418 Edes Avenue. DeVries Decl. ¶ 13.

**5. Illegal entry.**

In late October 2018, the Village trespassed on the parcel at 9418 Edes Avenue. Dunlap Decl. ¶ 18. The parcels at 9418 Edes Avenue and 606 Clara Street are approximately five (5) miles from the prior Village encampment in the Fruitvale district of Oakland, California. DeVries Decl. ¶ 14. The 9418 parcel was completely fenced with an iron-wrought fence that appears to have been cut or partially dismantled when the unsanctioned encampment formed. Dunlap Decl. ¶ 18. The unsanctioned encampment consists of tents, RVs, cars, constructed structures, chairs, and other outdoor furniture. Dunlap Decl. ¶ 18.

When the City learned that the Village was trespassing on City-owned property, City officials *immediately* contacted the organizers, expressed disagreement with their actions, and put them on notice that they were trespassing. DeVries Decl. ¶ 19. There are several reasons why 9418 Edes was and is unsuitable for an encampment. In particular, an encampment on this parcel

was unsuitable because of its close proximity to residential homes, the East Oakland Sports Center, the Brookfield Library, and Brookfield Elementary School. DeVries Decl. ¶ 20; Dunlap Decl. ¶ 17, Ex. H.

The City continued to work with Village organizers to reach a resolution that *did not* involve the Village trespassing on City-owned property that the City had *previously* determined was not suitable for the "managed" encampment. DeVries Decl. ¶ 21. However, the City maintained that it was working with organizers to solidify the 1449 Miller Avenue site for the "managed" encampment. DeVries Decl. ¶ 21.

**6. City's proposed closure.**

The Village organizers and unsanctioned encampment residents refused to leave the parcel at 9418 Edes Avenue. DeVries Decl. ¶ 22. Based on an illegal trespass, the unsanctioned encampment's close proximity to vital community resources for vulnerable residents (young children and senior citizens), and public health and safety concerns for the immediate surrounding community, the City determined that it would enforce a closure. DeVries Decl. ¶ 22; Declaration of Antonio Taylor ("Taylor Decl.") ¶¶ 1-10; Declaration of Brandon Johnson ("Johnson Decl.") ¶¶ 1-8; Declaration of Denise Dawson ("Dawson Decl.") ¶¶ 1-10; Declaration of Renee Sykes ("Sykes Decl.") ¶¶ 1-5.

The City posted notices to vacate the property on November 7, 2018. Dunlap Decl. ¶ 20. The City planned to enforce the closure on November 10, 2018. Dunlap Decl. ¶ 21. In preparing for the closure, City staff noted that, at the time, there was only one tent on site, several canopies with tables and chairs, and signage. DeVries Decl. ¶ 23. The City also ensured that outreach workers visited the unsanctioned encampment after the notice to vacate was posted to offer services and housing resources to the individuals in the unsanctioned encampment. DeVries Decl. ¶ 23;

**7. November 13, 2018 – present.**

Since the Court's hearing on November 13, 2018, the unsanctioned encampment has continued to grow in size – both in the number of individuals in the unsanctioned encampment as well as with the number tents, structures, and vehicles in and around the unsanctioned

encampment. DeVries Decl. ¶ 24. In particular, the unsanctioned encampment has grown in the short time between the court's order on November 13, 2018 and November 16, 2018. Dunlap Decl. ¶ 23, Exs. K, L, M. This violates the intent and spirit of the Court's order to maintain the status quo pending the hearing on November 26, 2018. In fact, the Court announced from the bench that both the City and the encampment must maintain the status quo, specifically admonishing Plaintiffs to maintain the number of residents and structures on the site.

**B. Procedural Background.**

Plaintiffs filed a *pro se* complaint and request for a temporary restraining order and preliminary injunction on November 9, 2018. Dkt. Nos. 1, 2, and 3. Plaintiffs allege that the City's proposed encampment closure will violate their Eight and Fourteenth Amendment rights. Compl. at 3. Specifically, the Plaintiffs allege that their factual situation was akin to that in both *Martin v. City of Boise*, 902 F.3d 1031 (2018) and *Pottinger v. City of Miami*, 810 F. Supp. 1551 (1992). Plaintiffs allege that the City's proposed closure criminalizes "inoffensive" conduct and their status as homeless individuals.

The Court considered the requirements of Federal Rule of Civil Procedure 65 and determined that a temporary restraining order was warranted *solely* to maintain the status quo because the proposed closure would happen before the next business day on which the Court could hear the City's opposition. November 9, 2018 Order at 2. The Court served the City with notice of the temporary restraining order after business hours on Friday, November 9, 2018 and, considering Monday, November 12, 2018, was a federal holiday, set a hearing the next court day.

The parties appeared for hearing on the temporary restraining order on November 13, 2018. The Court ordered that the temporary restraining order remain in place until the parties could fully brief the motion for preliminary injunction and the matter heard on November 26, 2018. Importantly, the Court also ordered Plaintiffs to maintain the status quo. Plaintiffs were instructed to refrain from moving additional individuals into the unsanctioned encampment – beyond the 13 who they represented to the Court were currently inhabiting the unsanctioned encampment – or building additional structures pending an order on the injunction.

Although the City was careful to adhere to the Court's November 13, 2018 Order,

Plaintiffs have not done so. The City is aware that, between November 14, 2018, and at least November 19, 2018 (the date of this filing), Plaintiffs (or others in the unsanctioned encampment) have been observed and documented building additional structures and bringing tents and other items to the encampment. Dunlap Decl. ¶ 23, Exs. K, L, M. During the November 13, 2018 hearing, the City expressed a serious concern that Plaintiffs would continue to grow the unsanctioned encampment if the temporary restraining order remained in place. As of November 19, 2018, the City's concerns are a reality.

## III. LEGAL ARGUMENT

### A. Standard of Review.

A party seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (internal citations omitted). Injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Winter*, 555 U.S. at 22 (2008) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)). A preliminary injunction is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).

A preliminary injunction will not issue simply to prevent the possibility of some remote future injury. *Winter*, 555 U.S. at 22 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494-95, 497-98 (1974)). A plaintiff must demonstrate that irreparable harm is "likely," not simply a mere possibility. *Id.* (citing *Mazurek,* 520 U.S. at 972). Courts must balance the competing claims of injury of each party and consider the effect of granting or withholding an injunction. *Id.* at 24 (citing *Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 542 (1987)). Moreover, courts must pay particular attention to the public consequences of granting the extraordinary remedy of an injunction." *Id.* (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305*,* 311-12 (1982)). An injunction should only issue where court intervention is essential to "protect property rights against injuries otherwise irremediable." *Weinberger,* 456 U.S. at 312 (citing *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).

**B. Plaintiffs are not likely to succeed on merits of their claims alleging violations of the Eighth and Fourteenth Amendment.**

**1. Eighth Amendment.**

Plaintiffs allege that the City's proposed closure violates their Eighth Amendment rights because they fear arrest and being forced into the elements and unsafe streets with no alternative shelter. Compl. at 6; Mtn. for Prelim. Injun. at 6-7. The Eighth Amendment prohibits cruel and unusual punishments. U.S. Const. Amend. VIII. The "cruel and unusual punishments" clause "circumscribes the criminal process in three ways." *Martin v. City of Boise (Martin)*, 902 F.3d 1031, 1046 (9th Cir. 2018) (citing *Ingraham v. Wright*, 430 U.S. 651, 667 (1997)). First, it limits the type of punishment the government may impose; second, it proscribes punishment "grossly disproportionate" to the severity of the crime; and third, it places substantive limits on what the government may criminalize. *Id.* The Ninth Circuit in *Martin* addressed the third limitation – and concluded that the government may not criminalize the status of being homeless. *Martin*, 902 F.3d at 1048. Plaintiffs essentially allege that, based on the holding in *Martin*, the proposed encampment closure criminalizes them for being homeless. Mtn. for Prelim. Injun. at 6.

In *Martin*, the Ninth Circuit considered the constitutionality of Boise's Camping Ordinance that made it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place *at any time*," and its Disorderly Conduct Ordinance that prohibited lodging or sleeping in any public place without the owner's permission. *Martin*, 902 F.3d at 1049 (emphasis added). The Ninth Circuit held that if a jurisdiction had more homeless individuals than the number of available shelter beds, it could not criminally prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public." *Martin*, 902 F.3d at 1048. The Ninth Circuit cautioned that its holding in *Martin* was narrow and *did not* require the city to allow homeless individuals to sleep in all public spaces or in the place of their choice:

> Our holding is a **narrow one**. . . . "we in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." **We hold only that** "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the jurisdiction cannot prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public."

> That is**, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property**, on the false premise they had a choice in the matter.

*Id*. (internal citations omitted) (emphasis added).

In reaching its decision in *Martin*, the Ninth Circuit followed its reasoning in *Jones v. Los Angeles*, where it found an ordinance that criminalized sitting, lying, or sleeping on public streets and sidewalks *at all times* and *in all places* within a city violated the Eighth Amendment. *Jones v. City of Los Angeles (Jones)*, 444 F.3d 1118, 1138 (9th Cir. 2006), vacated by settlement, 505 F.3d 1006 (9th Cir. 2007). In *Jones*, the Ninth Circuit similarly limited its holding stating:

> We **do not hold** that the **Eighth Amendment** . . . **prevents** the state from criminalizing **conduct that <u>is not</u> an unavoidable consequence of being homeless**, such as panhandling or obstructing public thoroughfares.

*Id*. at 1137 (emphasis added). The Ninth Circuit was consistent in holding that, while the Eighth Amendment might prohibit criminalizing the "unavoidable" consequences of being homeless – such as lying or sleep in public, engaging in *criminal* conduct – such as trespass and destruction of property – was "avoidable." The Eighth Amendment *does not* limit the government for criminalizing "avoidable" criminal conduct. *Martin*, 902 F.3d at 1048 ("[C]riminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing . . .") (citing *Powell v. Texas*, 392 U.S. 514, 533 (1968)). Moreover, the prohibitions of the Eighth Amendment are not triggered if there is an option of *sleeping indoors*. *Id*.

Plaintiffs argue their situation is factually and legally similar to that in *Martin*. This argument is without merit. The City's Policy and closure Procedures focus on preserving public health and safety. Dunlap Decl. ¶¶ 1-10, Exs. A, B. The Policy does not contemplate arrests or criminal citations during intervention or a closure. DeVries Decl. ¶ 23; Dunlap Decl. ¶¶ 1-10. The City does not criminalize the "unavoidable" conduct discussed in *Martin* that is related to being homeless such as simply sleeping, sitting, or lying outdoors. Declaration of Vijay Norfleet ("Norfleet Decl.") ¶¶ 7-15. Although Plaintiffs indicate that they fear arrest, the City's proposed

closure would not include arrest for simply sleeping, sitting, or lying outdoors.[1]

The Notice to Vacate posted on November 7, 2018 stated that the encampment was "uninhabitable," persons were "directed to vacate" and personal property left at the site would be "removed from the site and stored by Public Works." Dunlap Decl. ¶¶ 20-21, Ex. J. Nowhere in the notice did the City threaten arrests or cite to statutes or ordinances criminalizing conduct such as sleeping, sitting, or lying outdoors. *See, e.g., Sullivan v. City of Berkeley* (*Sullivan*), No. C 17-06051 WHA2017 WL 4922614, at *4 (N. D. Cal. Oct. 31, 2017) (finding that BART's actions in proposing a closure where homeless individuals were *trespassing* on BART property did not amount to "criminalization" and BART had "reasonably invoked" California's trespass statute preserving "one of the oldest, and most universally recognized features of the law" – the absence of which would allow anyone to live on any property).

Prior to the proposed closure, the City confirmed with a local shelter and/or City outreach workers that there was indoor bed space for each individual at the unsanctioned encampment. DeVries Decl. ¶ 23; Declaration of Blase Bova ("Bova Decl.") ¶¶ 10-12. Unlike the homeless individuals in *Martin*, the individuals in the unsanctioned encampment *had (and still have)* an option of sleeping indoors. *Cf. Martin*, 902 F.3d at 1049 ("We conclude that a municipality cannot criminalize such behavior consistently with the Eighth Amendment when *no sleeping space* is practically available in *any* shelter.") (emphasis added); *Pottinger v. City of Miami* (*Pottinger*), 810 F. Supp. 1551, 1564-65 (S.D. Fla. 1992)[2] (establishing at trial that "the City does not have enough shelter to house Miami's homeless residents" and concluding that *arresting* the homeless for harmless, involuntary, life-sustaining acts such as sleeping, sitting or eating in public is cruel and unusual.") (emphasis added).

Instead, the individuals in the unsanctioned encampment actively refuse to avail

---

[1] A Police Services Manager for the Oakland Police Department conducted a search for the number of citations issued for Oakland Municipal Code section 9.08.160 (sitting/lying on streets) over the last seven years. The Law Records Management System indicated that there were seven citations issued – but only one issued to a person identified as a "transient" (who was sleeping on a mattress in the middle of a sidewalk). Norfleet Decl. ¶¶ 7-15, Exs. D, E, F, G, H. The City understands that citations for Oakland Municipal Code section 9.08.160 may also be compiled by the Traffic Court. Limited research in the Traffic Court demonstrated that less than 30 citations were issued over a seven-year period. It was unclear whether those individuals were identified as "transients."

[2] Plaintiffs rely heavily on *Pottinger.* Although potentially instructive, this case is not controlling or binding on the Court.

themselves of available indoor shelter beds and their fear of arrest for simply sleeping outdoors is baseless. Bova Decl. ¶¶ 1-12, Exs. A, B. *See, e.g., Sullivan*, 2017 WL 4922614, at *5 (recognizing that plaintiffs "want to maintain a city within a city, to reside and to camp, day and night, on BART's property over its objection" and concluding that the relief plaintiffs sought, "court approval to settle *indefinitely* on the land of a municipal transportation district – would be *unprecedented*") (emphasis added).[3] For these reasons, Plaintiffs are unlikely to succeed on a claim alleging a violation of the Eighth Amendment.

**2. Fourteenth Amendment.**

**a. The City provides notice of stored property.**

Plaintiffs allege that they fear the City will seize and destroy their property during the encampment closure in violation of the Fourteenth Amendment. Compl. at 6; Mtn. for Prelim. Injun. at 7-8. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" *Lavan v. City of Los Angeles* (*Lavan*), 693 F.3d 1022, 1031 (9th Cir. 2012) (citing *Ingraham v. Wright,* 430 U.S. 651, 672 (1977)).

The Ninth Circuit has concluded that a homeless individual's unabandoned possessions are "property" within the meaning of the Fourteenth Amendment and a city must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy the property. *Lavan* , 693 F.3d at 1032; (citing *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 48 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property.")). The Ninth Circuit is clear that "[t]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue

[3] The City recognizes that it is distinguishable from BART because it is not a transportation district. However, unlike a transportation district, the City has taken many steps to address the problems associated with homelessness – instead of, prior to, and after an encampment closure. Dunlap Decl. ¶¶ 3-14; DeVries Decl. ¶¶ 4-6.

against the taking." *Id.* (citing *Clement v. City of Glendale,* 518 F.3d 1090, 1093 (9th Cir. 2008)).

The City's Policy and Procedures carefully preserve the Fourteenth Amendment property and due process rights of the individuals in a homeless encampment during a closure. The Notice to Vacate is visibly posted at least 72-hours prior to a proposed closure. Dunlap Decl. ¶¶ 10-12, Ex. C. The Notice to Vacate was visibly posted at the unsanctioned encampment on November 7, 2018. Dunlap Decl. ¶ 20, Ex. J. The Notice to Vacate advises encampment residents of the reason for the closure, instructs them to vacate *and* remove *any* personal belongings, and informs them that property that remains after the closure will be *stored* by Public Works unless it is unsafe or hazardous (in which case it is immediately discarded). Dunlap Decl. ¶¶ 11-14, Exs. C, D, E.

After a closure occurs, the City posts a Notice of Collected Property that identifies the location from which the property was collected, gives a telephone number to contact Public Works to *reclaim* the property, and indicates that the property will be stored for ninety (90) days.[4] Dunlap Decl. ¶ 14, Ex. E. Only property that is trash or unsafe for storage is discarded such as "open food or personal products that will spoil or rot in storage," "items that smell or are stained with urine, bodily waste, or mud," "items that could corrode or burn in storage (i.e. car batteries, gasoline cans, and propane tanks," "items broken, damaged or stripped of parts (i.e. electronics stripped for cooper, flat tires, torn up clothes." Dunlap Decl. ¶ 13, Ex. D.

Plaintiffs argue that the facts of the City's proposed closure and their situation are "identical" to those in *Pottinger*. Mtn. for Prelim. Injun. at 7. However, the plaintiffs in *Pottinger* alleged that the City of Miami had a "pattern and practice of seizing and *destroying* their personal property or *forcing them to abandon it* at arrest sites in violation of the Fourth, Fifth, and Fourteenth Amendments" and "*routinely fail[ed]* to follow its own inventory procedures with respect to the personal property of homeless people." *Pottinger*, 810 F. Supp. at 1570 (emphasis added). Unlike the plaintiff in *Pottinger*, Plaintiffs do not specifically allege and have no evidence that the City has a "pattern and practice" of seizing *and* destroying the personal property of homeless individuals. Further, Plaintiffs do not specifically allege and have no

[4] A Notice of Collected Property was not posted in this case because the City did not enforce the proposed closure in light of the Court's Temporary Restraining Order issued on November 9, 2018.

evidence that the City does not follow the guidelines for removing and *storing* personal property outlined in its Policy and Procedures for intervening in and closing encampments. *Winter*, 555 U.S. at 22 (instructing that a preliminary injunction will not issue simply to prevent the possibility of some remote future injury and a plaintiff must demonstrate that irreparable harm is "likely," not simply a mere possibility).

Moreover, a 72-hour Notice to Vacate provides reasonable notice and adequate due process prior to removing and storing personal property remaining at an encampment. Unlike the City of Miami in *Pottinger* and the City of Los Angeles in *Lavan*, the City does not seize or destroy property without notice. *Cf. Lavan*, 693 F.3d at 1025 (stating that the City of Los Angeles did not deny its policy to seize *and* destroy homeless persons' *unabandoned* possessions); *Pottinger*, 810 F. Supp. at 1570-73 (finding that the City of Miami *did not* follow its policy to tag and package property that it took into custody). The City allows encampment residents to retrieve personal property during a closure and stores it if it remains after a closure. Dunlap Decl. ¶ 10-14, Ex. B, C, E.

Moreover, the City follows the Policy and Procedures for personal property during encampment intervention and closure. *See, e.g., Sullivan*, 2017 WL 4922614, at *6 (recognizing that, unlike the City of Los Angeles (in *Lavan*), BART had a policy that gave homeless individuals 72-hour notice to remove property, stored property that remained at the site, and, importantly, *followed its policy* during an unrelated closure). There is no evidence that the City does not follow its Policy and Procedures. Accordingly, Plaintiffs are unlikely to succeed on a claim against the City alleging a violation of the Fourteenth Amendment for seizing and destroying property without due process.

**b. The City does not burden the right to travel.**

Plaintiffs allege that, similar to the plaintiffs in *Pottinger*, the City's proposed closure will impede their fundamental right to travel in violation of the Fourteenth Amendment. Mtn. for Prelim. Injun. at 7. The equal protection clause of the Fourteenth Amendment prohibits states from denying any person the equal protection of the laws. Equal Protection requires that all persons similarly situated be treated alike. *Pottinger*, 810 F. Supp. at 1577 (citing *City of*

*Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985)). After analyzing United States Supreme Court case law, the court in *Pottinger*, held that a city's enforcement of laws that prevent homeless individuals *who have no place to go* from sleeping, lying down, eating and performing other harmless life-sustaining activities burdens their right to travel. *Pottinger*, 810 F. Supp. at 1580. Although *Pottinger* is not controlling case law authority, to the extent the Court finds its reasoning compelling, the City has not violated Plaintiffs' right to travel.

The plaintiffs in *Pottinger* had nowhere else to go. *Pottinger*, 810 F. Supp. at 1581 (stating that enforcement of ordinances against the homeless when they have *absolutely no place* to go effectively burdens their right to travel). Importantly, the Plaintiffs in the instant case have been offered alternatives to sleeping outdoors. Dunlap Decl. ¶¶ 8-10; Bova Decl. ¶¶ 5, 10-12. Moreover, they have been offered a location in Oakland to maintain their "managed" encampment. DeVries Decl. ¶¶ 10-12. Instead, Plaintiffs have declared an "Occupy Oakland" type of resistance, have "taken over" the parcel at 9418 Edes Avenue, and will not move. Taylor Decl. ¶ 5, Ex. C. Plaintiffs will not move and have *completely disregarded* their trespass on City-owned property and the City's efforts to relocate them to a suitable site for a "managed" encampment. DeVries Decl. ¶¶ 10-13, 19-22. Plaintiffs cannot argue that the City has burdened their right to travel and, at the same time, refuse to accept any indoor *or* outdoor alternative to their current location. *Cf. Pottinger v. City of Miami*, 810 F. Supp. at 1580 ("[F]orcing homeless individuals from sheltered areas or from public parks or streets affects a number of "necessities of life"—for example, it deprives them of a place to sleep, *of minimal safety and of cover from the elements*.") (emphasis added). Plaintiffs are unlikely to succeed on a claim against the City alleging a violation of the Fourteenth Amendment for impeding their right to travel.

Even if, *arguendo*, the Court were to find that the City's actions were burdening Plaintiffs' right to travel, the City can articulate a compelling interest for implementing its Policy and Procedures to close the unsanctioned encampment. The City's Policy and Procedures are designed preserve public health and *safety*. DeVries Decl. ¶¶ 4-6; Dunlap Decl. ¶¶ 3-10, Ex. A. The court in *Pottinger* agreed that the City of Miami had a compelling interest in ensuring that its parks were free of crime. *Pottinger*, 810 F. Supp. at 1582. Moreover, the City's Policy and

Procedures outline an intervention and closure plan sanctioned by the court in *Pottinger*. *Pottinger*, 810 F. Supp. at 1582 (identifying the following less intrusive means to accomplish the city's interests: (1) providing alternative shelter and services; (2) temporarily relocating individuals while crews provide maintenance; (3) regular times for clean-up; (4) allowing individuals to remain in designated areas in exchange for agreeing to maintain that area); DeVries Decl. ¶¶ 4-6; Dunlap Decl. ¶¶ 3-10, Ex. A.

**C. Plaintiffs will not suffer irreparable harm if the Court does not enter a preliminary injunction.**

Despite their alleged concerns, Plaintiffs will not suffer irreparable harm if the Court does not enter a preliminary injunction. Plaintiffs identify the alleged irreparable harm that they will face if the City proceeds with the closure as: (1) removal from the parcel; (2) arrest; (3) lack of available shelter; (4) destruction/removal of personal property; and (5) unavailability of "safe zones." Compl. at 4-6; Mtn. for Prelim. Injun. at 6-8. As described below, the harm Plaintiffs identify is without merit, entirely speculative, or created by Plaintiffs' actions.

The City's Policy and Procedures involve removal not arrest. Dunlap Decl. ¶¶ 3-11. Plaintiffs are trespassing and have no legal right to remain on the City's parcel. As of the Court's November 13, 2018 hearing on the temporary restraining order, an indoor shelter bed was available for the 13 individuals in the encampment. Bova Decl. ¶¶ 5, 10-12. Prior to a closure, the City will ensure that there is indoor shelter for these individuals. The Notice to Vacate gives encampment residents 72-hours to remove personal property. Dunlap Decl. ¶¶ 10-14, Exs. B, C. The Notice to Vacate and the City's Policy and Procedures confirm that property that remains after the closure will be stored – not destroyed.

Finally, the City was actively negotiating a "safe zone" for the Village to maintain a "managed" encampment. DeVries Decl. ¶¶ 10-12. Plaintiffs thwarted the City's efforts when they trespassed on the 9418 Edes Avenue parcel within days of finalizing the new site. The 9418 Edes Avenue parcel is not a suitable "safe zone" for a "managed" encampment. DeVries Decl. ¶¶ 20-21. Although Plaintiffs argue that they will suffer irreparable harm, they have not identified harm that is more than a mere, remote possibility – or harm that they have not created. *Winter*,

555 U.S. at 22 (stating a plaintiff must demonstrate that irreparable harm is "likely," not simply a mere possibility).

**D. The balance of equities does not tip in favor of the Plaintiffs or the Court entering a preliminary injunction.**

The balance of equities does not tip in favor of the plaintiffs for maintaining the unsanctioned encampment. As the court noted in *Sullivan*, the balance of equities favored the public entity defendant, BART. The court stated that "forc[ing] BART to host the encampment would open BART to potential liability for failing to police the activities in the encampment." *Sullivan*, 2017 WL 4922614, at *6. The court found that the question of safety, crime, and BART's potential duty to provide services for individuals trespassing on their property prevents the "balance of equities from tipping in favor of plaintiffs at all." *Sullivan*, 2017 WL 4922614, at *6. Similarly, the City faces potential liability for crime and safety conditions in the unsanctioned encampment. *See, e.g.,* https://www.eastbaytimes.com/2018/11/17/oakland-homeless-camp-along-880-burns/ (an unsanctioned encampment burns near the freeway).

Plaintiffs cannot identify circumstances that tip the balance of equities in their favor. As described throughout the City's opposition, the City does not arrest individuals simply for sleeping outdoors during a closure, shelter beds are available, and belongings are stored if they remain on site after the closure. Further, City was negotiating a different outdoor space for Plaintiffs to maintain a "managed" encampment. Given these circumstances and the City's serious concerns regarding public health and safety, the balance of equities tips in the City's favor.

Moreover, residents of the unsanctioned encampment *directly and overtly* defied the Court's admonishment during the November 13, 2018. Residents of the unsanctioned encampment actively encouraged more individuals to come to the site since the November 13, 2018 hearing. DeVries Decl. ¶ 24; Taylor Decl. ¶¶ 7-10, Exs. E, F; Dunlap Decl. ¶ 23, Exs. K, L, M. City staff and community residents observed and heard residents in the unsanctioned encampment *constructing* new structures. Any argument that the equities scale should tip in Plaintiffs' favor is completely diminished because they did not comply with the November 26,

2018 in good faith.

**E. A preliminary injunction is not in the public's interest.**

Finally, and importantly, a preliminary injunction is not in the public's interest. The immediate surrounding community has complained about the health and safety conditions on the parcel. Taylor Decl. ¶¶ 1-10; Sykes Decl. ¶¶ 1-5; Declaration of Ray T. Leon ("Leon Decl.") ¶¶ 1-8; Merriouns Decl. ¶¶ 1-12. Community residents convened a meeting to voice and document their serious concerns to City officials. Johnson Decl. ¶¶ 1-8, Ex. A. Vulnerable community members such as young children and the elderly must pass the unsanctioned encampment to access services and resources intended *specifically* for them such as a preschool and elementary school, sports center, and senior center. Taylor Decl. ¶¶ 1-10, Exs. A-F; Dawson Decl. ¶¶ 1-10. Although being homeless is not synonymous with trash or crime, the community residents are alarmed at the trash, inoperable vehicles, and potential for fires and other hazardous. Dawson Decl. ¶¶ 1-10; Johnson Decl. ¶¶ 1-8, Ex. A. The City must not be prevented from exercising its municipal authority to close the encampment, clean the parcel, abate hazardous conditions, and restore health and safety to the community.

## IV. CONCLUSION

The City is continuing to increase its efforts to address the homeless crisis in many arenas, including advocating for increased state and county funding, raising significant private foundation money to fund prevention programs, and using bond money to acquire new properties to develop transitional housing. The City has taken many steps to relieve the dangers and health issues at encampments and continues to offer shelter and other services to those who are encamped.

//

//

//

//

//

//

//

The City is also committed to managing the existing street encampments in a manner that is compassionate and balances the needs of the unsheltered with the general need to maintain public health and safety for the entire community. The City reiterates that it is with great caution and regard that it determines to close an encampment. It is a delicate balancing effort to protect the constitutional rights of all Oakland residents. The City engaged in this balancing effort when it determined to close Plaintiffs' encampment. The City's proposed action is legal, constitutional, and justified. The motion for preliminary injunction must be denied.

Dated: November 19, 2018

BARBARA J. PARKER, City Attorney
MARIA BEE, Chief Assistant City Attorney
DAVID A. PEREDA, Special Counsel
JAMILAH A. JEFFERSON, Senior Deputy City Attorney

By: /s/ Jamilah A. Jefferson
Attorneys for Defendant
CITY OF OAKLAND