Joshua Piovia-Scott, Esq. [S.B. #222364]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Email: jps@hadsellstormer.com

Dan Siegel, Esq. [S.B. #56400]
EmilyRose Johns, Esq. [S.B. #294319]
SIEGEL, YEE & BRUNNER
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 839-1200
Facsimile:  (510) 444-6698
Email: danmsiegel@gmail.com
        emilyrose@siegelyee.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANITA MIRALLE, JODII LE'GRAND EVERETT, I, TINA SCOTT, AIYAHNNA JOHNSON, LUCAS D. BROWN; and IRVIN JOSUE HERNANDEZ ORTEGA<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF OAKLAND, a subdivision of the State of California; LIBBY SCHAAF; JOE DEVRIES; and DOES 1-10,<br><br>Defendants. | Case No.: 18-cv-06823-HSG<br><br>Assigned to the Honorable Haywood S. Gilliam, Jr. - Courtroom 2]<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>DATE:              November 26, 2018<br>TIME:              3:00 p.m.<br>CRTRM:          2, 4th Floor<br><br>Complaint filed:      November 9, 2018<br>Disc. Cut-Off:        None Set<br>Motion Cut-Off:      None Set<br>Trial Date:            None Set |

# TABLE OF CONTENTS

Page(s)

Table of Authorities ............................................................................................................. iii

I.      INTRODUCTION ...................................................................................................... 1

II.     STATEMENT OF FACTS .......................................................................................... 2

A.      The City of Oakland Has a Homeless Crisis ............................................................ 2

B.      The City Has a Pattern and Practice of Regularly Criminalizing Homeless
        People for Sleeping on Public Property ................................................................... 3

C.      The City Has a Pattern and Practice of Destroying Homeless Residents'
        Personal Property ..................................................................................................... 5

D.      The Village Establishes a Community in Marcus Garvey Park and Provides
        Services ..................................................................................................................... 6

E.      The City Destroys Marcus Garvey Park Village and Fails to Provide Alternative
        Housing ..................................................................................................................... 7

F.      The City Repeatedly Refuses to Provide the Village an Alternative Site ................ 7

G.      The City Finally Provides a Location for a New Village but Prevents Them From
        Establishing Their Drug Free Community There ...................................................... 8

H.      The City Offers a Site on Miller Ave to be Run by the Village but that Would Not
        be a Sober Encampment for Women and Their Families Where the Plaintiffs Live ....... 9

I.      Plaintiffs Establish the Housing and Dignity Village ............................................. 10

J.      The Housing and Dignity Village Receives Extensive Community and Political
        Support .................................................................................................................... 11

K.      The City Threatens Plaintiffs With Criminal Sanction for Sleeping on Public
        Property ................................................................................................................... 13

L.      Plaintiffs Follow the City's Directions on How to Find Shelter After Receiving the
        Notice but no Shelter is Available .......................................................................... 14

M.      Plaintiffs Have Maintained the Status Quo as Directed by the Court ..................... 15

/ / /

III.   ARGUMENT .................................................................................................................... 16

A.   Plaintiffs Are Entitled to a Preliminary Injunction ......................................................... 16

   1.   Plaintiffs Have a Likelihood of Success ................................................................ 16

      a.   Plaintiffs Have Standing ................................................................ 16

      b.   Plaintiffs Have Raised Serious Questions Regarding the Merits of Their Eighth Amendment Claim ..................................................................... 19

         i.   The Homeless Crisis in Oakland is Much Worse Than the Situation in Martin .................................................................... 19

         ii.   Plaintiffs Are Being Threatened with Criminal Sanction for Sleeping on Public Property Just Like in Martin ......................................... 20

         iii.   Plaintiffs Are Being Forced to Sleep on Public Property Just Like in Martin ........................................................................... 22

         iv.   Plaintiffs in This Case Seek Much More Limited Relief Than in Martin.......................................................................... 23

      c.   Plaintiffs Have Raised Serious Questions Regarding the Merits of Their Fourteenth Amendment Claim for Violation of Due Process ...................... 27

         i.   Procedural Due Process ............................................................... 24

         ii.   The City Does Not Provide Adequate Notice To Residents Before Removing Their Property............................................ 24

         iii.   The Plaintiffs' Property Will Be Destroyed And They Will Have No Meaningful Opportunity To Argue Against Its Destruction..................... 27

         iv.   The City Is Deliberately Indifferent To The Danger To Which It Will Subject Plaintiffs If It Evicts Plaintiffs From Their Encampments ........... 23

   2.   Plaintiffs Will Suffer Irreparable Harm Without an Injunction.......................................... 31

   3.   The Balance of Equities is in Plaintiffs' Favor and an Injunction is in the Public Interest ............................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................ 16, 32

*Allen v. City of Lake*,
71 F. Supp. 3d 1044 (N.D. Cal. 2014) ........................................................ 33

*Ariz. Dream Act Coal. v. Brewer*,
818 F.3d 901 (9th Cir. 2016) .................................................................... 32

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ................................................................................. 20

*City of West Covina v. Perkins*,
525 U.S. 234 (1999) ................................................................................. 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................. 16

*Cobine v. City of Eureka*,
250 F. Supp. 3d 423 (N.D. Cal. 2017) ........................................................ 31

*DHX, Inc. v. Allianz AGF MAT, Ltd.*,
425 F.3d 1169 (9th Cir. 2005) .................................................................... 17

*Giovani Carandola, Ltd. v. Bason*
303 F.3d 507 (4th Cir. 2002) ..................................................................... 33

*Ingraham v. Wright*
430 U.S. 651 (1977) ................................................................................. 18

*Jones v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006) ............................................................ *passim*

*Joyce v. City & County of San Francisco*,
846 F. Supp. 843 (N.D. Cal. 1994) ............................................................ 18

*Kennedy v. City of Ridgefield*,
439 F.3d 1055 (9th Cir. 2006) ............................................................ 29, 30

*Lavan v. City of Los Angeles*,
693 F. 3d 1022 (9th Cir. 2012) ........................................................... *passim*

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ..................................................................... 33

*Lehr v. City of Sacramento*,
    624 F. Supp. 2d 1218 (E.D. 2009) ................................................................. 17, 18

*Los Padres Forestwatch v. U.S. Forest Service*,
    776 F. Supp. 2d 1042 (N.D. Cal. 2011) ............................................................. 33

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 16

*Martin v. City of Boise*,
    902 F. 3d 1031 (9th Cir. 2018) ................................................................*passim*

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................... 27

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ............................................................................ 32

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ............................................................................ 32

*Nelson v. Nat'l Aeronautics & Space Admin.*,
    530 F.3d 865 (9th Cir. 2008) ............................................................................ 32

*Pottinger v. City of Miami*,
    810 F. Supp. 1551 (S.D. Fla. 1992) ............................................................ 21, 32

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) .......................................................................... 17

*Sanchez v. City of Fresno*,
    914 F. Supp. 2d 1079 (E.D. Cal. 2012).................................................. 29, 30, 31

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) .......................................................................... 16

*Sturgeon v. Frost*,
    136 S.Ct. 1061 (2014)........................................................................................ 18

*Sullivan v. City of Berkeley*,
    2018 U.S. Dist. LEXIS 164686 (N.D. Cal. October 31, 2017)..................... 23, 24

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014).................................................................................. 16, 18

*Vivid Entm't, LLC v. Fielding*,
    774 F.3d 566 (9th Cir. 2014) ............................................................................ 16

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................... 16

## STATE STATUTES

Cal. Penal Code § 602(m) .................................................................. 22

California penal code 647(e) ............................................................... 4

Los Angeles Municipal Code section 56.11 ...................................... 26

Oakland Municipal Code 12.64.100 ................................................... 4

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VIII .............................................................. 17, 18

U.S. Const. amend. XIV ................................................................... 27

# I.  INTRODUCTION

"One of the reasons why I moved into the Housing and Dignity Village is because of the constant risks I face as an unsheltered woman, including the risk of predators.  Living in constant fear is part of what drove me to help establish, and move into, this community for sober unsheltered women and their families." -Plaintiff Anita Miralle.

The fact that tens of thousands of people are forced to sleep in the streets every night in the Bay Area, one of the wealthiest regions in the world, is a disgrace.  The City of Oakland's Opposition confirms what we already know: we are in the midst of a crisis of homelessness.  What the City does not say is that while there are at least 14,000 unsheltered people on the streets of Oakland, there are only 460 shelter beds available.  While the City claims that its policies prevent the destruction of unsheltered people's property when it demolishes their encampments, and that its policies do not criminalize unsheltered persons, the 20 declarations filed by Plaintiffs attest to the fact that the City does exactly that. If the Defendants were "within days" of finalizing a new site for the Plaintiffs to live after evicting them from Marcus Garvey Park in February 2017, why did they serve Plaintiffs with a three-day Notice to Vacate on November 7, 2018?  We need a number of different approaches to address the crisis of homelessness, but forcibly evicting this group of sober, unsheltered people who are actually providing services to the community from the vacant City-owned lot where they currently reside will do nothing to address this crisis, and will in fact make it worse.

This is the narrow, limited relief that Plaintiffs seek herein: to prevent this group that has cleaned and maintained the public property, and provides food, clothes and other programs for the community, from being forcibly evicted at the threat of criminal sanction, without due process, from the relative safety of the Village and thrown back out onto the streets.  The City's claim that it is the one that is providing "a clean, safe, vibrant and thriving community" for the residents in the Brookfield neighborhood is sadly ironic as it is the Plaintiffs who have turned a City owned lot that has been vacant and unused for the last ten years into "a clean, safe, vibrant and thriving community."  Defendants' contention that the Plaintiffs are somehow endangering "the community's most vulnerable residents" should be disregarded as it is the unhoused Plaintiffs that are the community's "most vulnerable residents."  The City's claim that Housing and Dignity Village should be demolished because it is near a school and the neighbors have complained should be rejected as one of the Plaintiffs works as a school

activities leader at that very same school, and Plaintiffs have submitted a wealth of evidence of the neighborhood's support for them.  Defendants' allegation that the Plaintiffs have not maintained the status quo pursuant to the Temporary Restraining Order is inaccurate as the Plaintiffs have declined multiple requests from other unhoused residents to live in the Village and, while they have prepared the encampment for the rain and changed the locations of some of their tents, they have not constructed any additional structures.

As outlined in detail below, Plaintiffs are entitled to either a preliminary injunction allowing them to stay in their current location, or an injunction allowing them to stay until the City follows through on its promise to provide a suitable alternative location, under the recent Ninth Circuit decisions in *Martin v. City of Boise*, 902 F. 3d 1031 (9th Cir. 2018) and *Lavan v. City of Los Angeles*, 693 F. 3d 1022 (9th Cir. 2012).

## II.  STATEMENT OF FACTS

### A.  The City of Oakland Has a Homeless Crisis

In May 2017, Assistant City Administrator and Defendant Joe DeVries stated that, in 2015, Oakland "had 14,000 unsheltered people on the street at night and that number has exploded."[1]  In contrast, the City's own calculations provide that the number of available shelter beds is approximately 350, with an additional 110 beds in the winter months. (Doc. 28 , Ex. 1, p. 5)

The Oakland City Council declared a "shelter crisis in the city of Oakland" in October 2017 based on the City's own conclusion "the current number of homeless individuals in Oakland far outpaces the number of existing shelter beds, transitional housing or permanent supportive housing units available." Oakland, Cal. Ordinance 13,456 (October 3, 2017) (Doc. 28 , Ex. 1, p. 9).  This ordinance was based on a finding by the City "that a significant number of persons are without the ability to obtain shelter, and that the situation has resulted in a threat to the health and safety of those persons." *Id.*  The City Council declared that "this shelter crisis affects Oakland's citizens disproportionately with more African American, Latino and elderly individuals experiencing homelessness" and "the long term and recent decreases in Federal and State funding for housing programs has resulted in an erosion of shelter options

---

[1] http://www.ktvu.com/news/number-of-homeless-in-oakland-projected-to-grow

for the most vulnerable populations including the elderly, youth, victims of domestic violence, sexually exploited minors and persons suffering from mental illness, HIV/AIDS, substance abuse and disabilities." *Id.* The City also declared that "analysis and evidence has demonstrated that providing decent, safe and stable housing combined with crucial support services are two primary components of successful transition from homelessness to a safer and healthier way of living." *Id.*

The UN Special Rapporteur on housing conducted an extensive investigation of informal settlements around the world, including those in Oakland, and concluded in a report submitted on September 19, 2018 that "the scope and severity of the living conditions in informal settlements make this one of the most pervasive violations of human rights globally. The world has come to accept the unacceptable. It is a human rights imperative that informal settlements be upgraded to meet basic standards of human dignity." (Summary, p. 2). The UN representative visited encampments in Oakland and concluded that Oakland's "[a]ttempt[s] to discourage residents from remaining in informal settlements or encampments by denying access to water, sanitation and health services and other basic necessities, as has been witnessed by the Special Rapporteur . . . constitutes cruel and inhuman treatment and is a violation of multiple human rights . . . . Such punitive policies must be prohibited in law and immediately ceased" (p. 12). The report recommends "building on the capacities of residents of informal settlements to direct and manage upgrading processes. Rather than criminalizing residents of informal settlements." (p.4). "States should immediately cease and desist from seeking to justify evictions of residents of informal settlements under domestic legal procedures. Courts should refuse to authorize such evictions in any but the most exceptional circumstances, and only when residents have been fully engaged in the process, when alternative housing of comparable or better quality is being provided and when all other requirements of international human rights have been honoured. Applications to evict are almost always indicative of flawed processes and lack of meaningful engagement with communities." (p. 9).

**B.**     **The City Has a Pattern and Practice of Regularly Criminalizing Homeless People for Sleeping on Public Property**

While Defendants rely on their self-serving declarations and incomplete policies regarding their relationship and interactions with the homeless people sleeping in the City, the many declarations

obtained and submitted by Plaintiffs reveal the City's real practices and confirm that it regularly violates the constitutional rights of its homeless residents. The Defendant's own standard operating procedure for removal of homeless encampments acknowledges the use of the Oakland Police Department ("OPD"). (Dunlap Decl. ¶ 10, Ex. B). Defendants have not presented their full policy[2] or procedures, nor are they giving an accurate account of what actually happens in practice.

People sleeping on public property in the City of Oakland do so because they have nowhere else to go. (Hansen Decl., ¶ 5, Semien Decl., ¶¶ 2, 8, Walker III Decl., ¶ 11, Opdyk-Orthmeyer Decl., ¶ 8). The OPD regularly cites homeless people for sleeping in public, trespassing, illegal camping, including for violations of Oakland Municipal Code 12.64.100 and California Penal Code 647(e). (Johnson Decl. ¶ 5, Hansen Decl., ¶¶ 4, 6, 7, Semien Decl., ¶ 3, Miller Decl., ¶ 7, Ewing Decl., ¶ 5, Foster Decl., ¶¶ 9-10, Wilson Decl., ¶¶ 8-10, Brum Decl., ¶¶ 7-8, Opdyk-Orthmeyer Decl., ¶¶ 5, 9).[3] The OPD regularly threatens homeless people with citation and/or arrest for sleeping in public. (Miller Decl., ¶ 8, Ewing Decl., ¶ 7, Walker III Decl., ¶¶ 5, 7, Foster Decl., ¶ 8, Brum Decl. ¶ 7, Opdyk-Orthmeyer Decl., ¶¶ 5-7, 10). The OPD regularly tells homeless people that they need to move or they will be arrested or cited. (Hansen Decl., ¶ 4, Semien Decl., ¶ 3, Foster Decl., ¶ 8, Brum Decl., ¶ 12, Opdyk-Orthmeyer Decl., ¶ 6).

The OPD gives people tickets when they don't move in response to a posted notice. (Ewing Decl., ¶¶ 3-5, Opdyk-Orthmeyer Decl., ¶ 9). The OPD is always present and involved when the City enforces a notice to vacate or clean. [Shannon Decl. ¶ 10 ("counted approximately 20 Oakland Police officers present), Hansen Decl., ¶ 8, Semien Decl., ¶ 6, Miller Decl., ¶ 9 ("seems like the police run the show, there are always about 5-7 cops during my evictions", Brum Decl., ¶¶ 12, 16 (has seen as many as

---

[2] During the July 12, 2018 Police Commission meeting, the Oakland Police Department reported that their "Response to Homelessness" has not been updated in 22 years and is currently in draft form. During the report, Acting Assistance Chief Armstrong stated: "We don't have a policy that's in line with our current method that we're using." The Commissioner asked for an updated policy or progress report by September 2018. At the September 27, 2018 meeting, Oakland Police was instructed to present its policy to the Commission by the first meeting in December 2018. (July 12, 2018 at http://oakland.granicus.com/MediaPlayer.php?publish_id=d41b74ca-86c7-11e8-a691-00505691de41; September 27, 2018 meeting at http://oakland.granicus.com/MediaPlayer.php?publish_id=80d04bda-c347-11e8-a2a6-0050569183fa

[3] Oakland is also among the many California cities recently criticized by UC Berkeley for the rise in enactment and enforcement of anti-homeless laws. https://www.law.berkeley.edu/wp-content/uploads/2015/12/Californias-New-Vagrancy-Laws.pdf

12 officers at evictions, and 5 cars with 8-10 officers at others), Opdyk-Orthmeyer Decl., ¶ 12 (has seen as many as 12 officers at evictions)].  People living in the place where the City posts a notice to vacate or clean often leave the location because they are afraid, intimidated, worried about citation and/or arrest, worried about losing their possessions.  (Miller Decl., ¶ 7, Walker III Decl., ¶¶ 5-6, 10-12, Opdyk-Orthmeyer Decl., ¶ 10).  Many homeless are people of color and acutely aware of the long history of excessive and deadly force by the OPD toward people of color, and this has a significant impact on their response to the OPD's threats and intimidation. (Walker III Decl., ¶ 8).  The OPD has also given homeless people citations when no notice to vacate has been posted at all.  (Hansen Decl., ¶ 7, Foster Decl., ¶¶ 9-11, Wilson Decl., ¶¶ 8-12, Brum Decl. ¶¶ 7-8, Opdyk-Orthmeyer Decl., ¶ 5).

When the City cites people for camping on public property, they do not tell the person where they can stay.  (Hansen Decl., ¶¶ 5, 8, Semien Decl., ¶ 3, Foster Decl., ¶¶ 9-13, Wilson Decl., ¶¶ 8-11).  When the City posts notices to vacate or clean up, they also do not inform the people being displaced by the notice where they can stay. (Hansen Decl., ¶¶ 5, 8, Brum Decl., ¶¶ 13-15).  In fact, the City's repeated response to requests for identified safe locations has been that "we can't tell people where they can go." (Shannon Decl. ¶¶ 14- 18).  Even when a notice to temporarily vacate has been posted, the OPD has told people to leave and not return, and that they will be cited and/or arrested if they return. (Brum Decl., ¶ 12).

## C.    The City Has a Pattern and Practice of Destroying Homeless Residents' Personal Property

When the City officials, including the OPD, arrive to enforce a notice to vacate or clean, they inform the people who live there that they have approximately 30 minutes to move their belongings. (Semien Decl., ¶ 6, Brum Decl., ¶ 13).  If property has not been cleared in time, the City disposes of all property present, often using machinery and compactor to accomplish this task. (Hernandez Decl. ¶ 8; Ewing Decl. ¶¶ 3-4; Hansen Decl. ¶ 8; Blum Decl. ¶¶ 13-14; Semien Decl. ¶¶ 6-7, November 21 Miralle Decl. ¶¶ 9-12.)  The City does not store people's belongings when they enforce a notice to vacate or clean but instead throw people's belongings away.  (November 21 Miralle Dec. ¶12, Hansen Decl., ¶ 8, Semien Decl., ¶¶ 6-7 (including their tents, books, journals, clothing, bedding, shoes, important papers and personal items), Ewing Decl., ¶ 4 ("I didn't move [in response to a notice] and they took my stuff and threw it away", Brum Decl., ¶¶ 13-14 (identification, important papers, money, tents, bicycles; Opdyk-

Orthmeyer Decl., ¶ 13 (clothes, box of gifts for kids, "everything I needed to survive"); Hernandez Decl., ¶¶ 4, 9 (shelter, identification, work uniform, clothing).]  The City instead destroys personal property, even when the evicted person objects and asks them to store their belongings.  (Opdyk-Orthmeyer Decl., ¶ 13, 15, 16).

**D.     The Village Establishes a Community in Marcus Garvey Park and Provides Services**

The group known as "the Village" began as a grassroots movement in December 2016.  The Village was formed as a collective of housed and unhoused Oakland residents to address the city's failure to respond to rising displacement from gentrification, with a mission to provide basic rights and needs including shelter, food, provisions, support, recreation, job skills, healing, and dignity. (November 21 Miralle Decl., ¶ 2).  In January 2017, the Village established housing for 16 homeless people who were unsheltered at Marcus Garvey Park on 36th Street and Martin Luther King Drive in Oakland. (November 21  Miralle Decl., ¶ 3).  Prior to establishing the shelters at Marcus Garvey Park, the Village cleaned the non-recreational areas of the park that they used for shelter, which had been covered with trash and debris, including many used syringes.  They also repaired the Park's sewage and drainage systems, which had been neglected by the City. (November 21 Miralle Decl., ¶ 4-5).

The Marcus Garvey Village provided services to the residents and broader community, including a health and healing clinic, hot home-cooked meals, a porta-potty, two hot showers in enclosed quarters, gardens and a center for distributing donations to Oakland residents in need, including both the housed and the unhoused. (November 21 Miralle Decl., ¶ 6-7).  News of these services quickly spread and although the Marcus Garvey Village only survived for 13 days before being bulldozed, the Village was able to provide services to approximately 400 people. The community was tremendously supportive.  Residents in the community signed a petition that was delivered to Defendant Joe DeVries that showed the Village had the support of the community (*see* Exhibit A to the November 21 Miralle Decl., ¶ 7).  About four days after they cleaned up the park and established the shelters, Mr. DeVries came to the park and told them that it was illegal to be there and that they could not stay.  Neither Mr. DeVries, nor any other City representative, attempted to work with Ms. Miralle or the Village to locate housing or alternative encampment locations for them to live.  Instead, a few days later, the City came back and posted an eviction notice. (November 21 Miralle Decl., ¶ 8).

**E.    The City Destroys Marcus Garvey Park Village and Fails to Provide Alternative Housing**

On February 2, 2017, the City of Oakland arrived at Marcus Garvey Park with a bulldozer, 2 dump trucks and approximately 80 OPD officers in full riot gear with dozens of zip tie handcuffs hanging from their belts.  The officers stormed the encampment at approximately 7 a.m. and, among other things, kicked in the door of a shelter and yanked a 75-year-old homeless resident out of her bed. (November 21 Miralle Decl., ¶ 9-10).  One woman who was sitting in a shelter refused to move and was arrested. (November 21 Miralle Decl., ¶ 10).  The City did not offer shelter or housing to any of the 16 homeless persons impacted by this eviction, and did not offer any services either prior to, during, or after the eviction.  All 16 unhoused people who were evicted from the Marcus Garvey Village in February 2017 remain homeless. (November 21 Miralle Decl., ¶ 9-10).  The City destroyed most of the residents' personal property and the materials that they used to provide services to the community in connection with the eviction. (November 21 Miralle Decl., ¶ 12).

During the eviction, dozens of residents and volunteers went down to City Hall to speak with Mr. DeVries to attempt to stop the eviction, while the remainder of those involved struggled to assess and address the trauma just experienced as a result of the eviction.  The group that went to DeVries' office demanded that the City address this situation, and as a result of those efforts on behalf of the Village, the Homeless Advocacy Working Group ("HAWG") was formed. (November 21 Miralle Decl., ¶ 13).  Ms. Miralle is currently a member of the steering committee of HAWG. (November 21 Miralle Decl., ¶ 13).  At the time of the eviction, 137 homeless persons had signed up indicating they wanted to move into the Marcus Garvey Village, in part because of the mission of the group and because they were (and still are) the cleanest, most peaceful encampment in Oakland.  At least two of the women who signed up to move into the Marcus Garvey Village have since died (one woman was raped and murdered in her tent and another woman died of pneumonia in her tent).  (November 21 Miralle Decl., ¶ 14). there is now another encampment (not managed by the Village) at Marcus Garvey Park. (November 21 Miralle Decl., ¶ 15).

**F.    The City Repeatedly Refuses to Provide the Village an Alternative Site**

As a result of the advocacy efforts of HAWG, the Oakland City Council directed the City Administrator in April 2017 to identify and authorize vacant sites to be used for tent/RV use, and to increase social service support for homeless encampments. (*See* the April 25, 2017 City Council minutes

attached as Exhibit B to the November 21 Miralle Decl., ¶ 16).  Then, in September 2017 (again as a result of the advocacy efforts of HAWG) the City Council declared a Shelter Crisis (*see* Exhibit 3) and directed the City Administrator to identify land specifically the Village. (*See* the September 26, 2017 City Council minutes attached as Exhibit C to the November 21 Miralle Decl., ¶ 17).  The City Administrator identified a number of potential sites that the Village could use to create the type of clean, constructive, service providing community that it had at Marcus Garvey Park but each time the Village selected one of the sites identified by the City, including one potential site at MacArthur and Martin Luther King Jr. Way, the City Administrator denied the Village use of the selected site. (November 21 Miralle Decl., ¶ 18).

**G.     The City Finally Provides a Location for a New Village but Prevents Them From Establishing Their Drug Free Community There**

In October 2017, after months of being repeatedly being denied use of the sites identified for them, the Village was finally granted use of the site at E. 12 Street and E. 23rd Avenue.  The Village had asked for different sites because this site was under a freeway, which meant that residents on the site would be subjected to endless environmental and noise pollution. The Village is adamant about the dignity of the homeless individuals that it serves and it wanted to ensure that homeless people were not being forced onto the most undesirable plots of land. However, as this was the only location that the City offered, the Village ultimately agreed to accept it. (November 21 Miralle Decl., ¶ 19).

The City would not sign a lease with the Village for the land until the Village found a non-profit fiscal sponsor.  The Omni agreed to be the Village's fiscal sponsor. Once the Village secured a fiscal sponsor, the City decided that the Village needed a $2,000,000 insurance policy.  (November 21 Miralle Decl., ¶ 20).  While the Village negotiated these hurdles with the City, the City began moving people onto the land they offered the Village without notifying the Village. When they were offered the site, approximately 10 individuals were already living there.  However, the City did not work with the Village in good faith because without their knowledge, the City evicted approximately forty persons from six different encampments from across five different neighborhoods, including many rival gang members and individuals suffering from drug addiction, and herded them all onto the E. 12 Street and 23rd Avenue site that they had offered to the Village. (November 21 Miralle Decl., ¶ 22).  These new residents were

forced onto the land and not given a choice to participate in the Village, thereby ending any control or vision the Village (which, among other things, is a drug-free community) had for the E. 12 Street and 23rd Avenue site. (November 21 Miralle Decl., ¶ 22).

In March 2018, the state of California informed the Village that the land the City had provided for them at E. 12 Street and 23rd Avenue was not owned by the City and had been slated by CalTrans, who had no idea the City had offered them this land, for retrofit. The City told the Village that the individuals they had herded to that parcel must once again move. (November 21 Miralle Decl., ¶ 25).

**H.** **The City Offers a Site on Miller Ave to be Run by the Village but that Would Not be a Sober Encampment for Women and Their Families Where the Plaintiffs Live**

Earlier this year, the Village began working with Lao Family Community Development Inc. ("Lao") because they are two blocks away from the E. 12 Street location and working with community neighbors and developing partnerships with them is a fundamental principle and practice of the Village. Another reason the Village began working with Lao was because the City had previously denied working with the Village was because it did not have a $2 million insurance policy and Lao has a $5 million policy. (November 21 Miralle Decl., ¶ 26). After the Village and Lao agreed to move forward on a new site, the City agreed to work with The Village and Lao to develop a separate encampment, potentially on Miller Avenue, for homeless residents who were currently facing eviction at the E. 12 Street and 23rd Avenue site. (November 21 Miralle Decl., ¶ 27). The Miller Avenue site was never intended nor negotiated to be the site for Ms. Miralle or any other Plaintiffs. The vision of The Village has always been to establish several villages to meet the intersectional needs of the unsheltered Oakland community, including one for seniors, one for men's healing, one for the LGBTQ community, and one for sober women and their families. The Miller Avenue site was negotiated to be a site to provide intergenerational harm reduction for the community currently at E. 12 Street and 23rd Avenue, not village for the sober women and their families who currently live at HDV. The Plaintiffs, including Ms. Miralle, were never among the residents at E. 12 Street and 23rd Avenue, nor were they the intended residents for the Miller Avenue site. (November 21 Miralle Decl., ¶ 28). The Miller Avenue site is not yet available, no one has moved there at this time and the Village is concerned that the City will obstruct the process as they have on previous occasions. (November 21 Miralle Decl., ¶ 29-30).

**I.    Plaintiffs Establish the Housing and Dignity Village**

On October 27, 2018, Ms. Miralle was part of a coalition (including The Village and the East Oakland Collective) who established the HDV, a site for sober, unsheltered women and their families located at 606 Clara Street and 9418 Edes Avenue in Oakland. (*See* the community rules attached as Exhibit E to the November 21 Miralle Decl., ¶ 31).  At the October 30, 2018 City Council Meeting, an agenda item included review of the pending license agreement with Lao to operate and manage an encampment in partnership with the Village. (*See* the October 30, 2018 meeting agenda attached as Exhibit F to the November 21 Miralle Decl., ¶ 32).  At the meeting, the Council was informed that a separate village (than the one intended for the Miller Avenue) had just been established and that Ms. Miralle had personally moved into this new village called HDV which was separately established as village for sober unsheltered women and their families. (November 21 Miralle Decl., ¶ 32).

Part of why Ms. Miralle helped establish HDV is based on her personal experiences of being homeless in Oakland.  Several months before settling in HDV, she went from being a housed homeless advocate to a homeless person herself.  Ms. Miralle and her daughters were living in a camper and were looking for a safe place to sleep every night.  They were frequently harassed by the OPD, who would tell Ms. Miralle that she couldn't park her camper in certain places, ask if she was sleeping in her car, tell her it is illegal to sleep in her car, and threaten to give her a ticket. (November 21 Miralle Decl., ¶ 33).  One of the biggest reasons Ms. Miralle moved to HDV is because of the constant risks she and her daughters face as unsheltered women, including the risk of predators.  While living in her camper, Ms. Miralle experienced men trying to break in during the night, and she quickly learned that if they stayed in a place longer than one night, they were at risk of predators figuring out that women were living alone in a camper.  The level of stress involved with this vulnerability and living in constant fear is part of what drove Ms. Miralle to help establish, and move into, the HDV for sober unsheltered women and their families. (November 21 Miralle Decl., ¶ 34).

None of the residents of HDV, broke or cut the lock to enter the property nor did any of them do any damage to any of the fences on the lot.  The lot had not been utilized for years, except for illegal dumping.  When they arrived, there was trash strewn throughout the site, including abandoned tires, appliances, construction rubble, household trash, large tree branches and other landscaping debris that

had been dumped. (November 21 Miralle Decl., ¶ 35-36). They spent approximately two days cleaning the site, removing the weeds, and making at least four trips to the dump. Once the lot was cleared, they established HDV as a sober space to provide shelter for women and their unsheltered families, and for their unsheltered male support who provide security and legal observation. The men they invited to live there are trusted and help them deter predators by projecting that there are not only women living here. (November 21 Miralle Decl., ¶ 37-38).

HDV is also a community service hub for the housed and unhoused community members in the Brookfield community. They open HDV four days a week for the community to join us for breakfast and dinner, to obtain clothing, blankets and supplies provided by HDV, use the compost toilet, receive medical care, visit with an inter-faith pastor and community Chaplain, and to just have a safe space to convene in our home community of East Oakland. (November 21 Miralle Decl., ¶ 40-41). They have a medical tent, a small community garden and solar panels that provide some electricity to the encampment. This allows them to provide a charging station to charge cell-phones and other electronics for the broader community. They also provide fee WiFi to the broader community. More than 175 persons have used HDV's services so far. (*See* the sign in sheet for those who have used HDV's services attached as Exhibit G to the November 21 Miralle Decl., ¶ 41). HDV has an outdoor kitchen built to professional vending standards that includes two small refrigerators and a freezer which run on solar energy from donated solar panels. They also have system for compost, recycle, and landfill, which is removed off site once a week on Tuesdays. (November 21 Miralle Decl., ¶ 42). HDV also has a compostable, enclosed toilet which uses proper compostable methods for human feces including use of compostable bags, sawdust, and regular removal. This toilet is open for use to their neighboring homeless residents and housed local community volunteers have reported a reduction in public urination and defecation in the surrounding areas since HDV opened. (November 21 Miralle Decl., ¶ 43).

J.      **The Housing and Dignity Village Receives Extensive Community and Political Support**

Nina Parker is a 19-year Oakland resident who lives about four blocks from the Housing and Dignity Village. (Parker Decl., ¶ 2-3). Ms. Parker is a member of the Greater Mt. Calvary Church located two blocks from HDV and she describes her experience with and observation of HDV and the Plaintiffs as follows: "A couple weeks ago, I was walking home from church when I ran into [Plaintiff]

Aiyahnna Johnson who invited me to come visit HDV. I did visit, and I saw the services HDV is providing to the community. The people here at HDV feed people, communicate with people, love people, and give what they can to the many people in need in this community." (Parker Decl., ¶ 5-6). "I have been frequently visiting HDV ever since . . . I stop by in the mornings or evenings to volunteer. I come bring food or donations, or even pick up items I have needed myself like soap and tissue. I see many people in need receiving hot meals, support, clothes and other materials from HDV. I see residents, volunteers and local community members coming together to make meals and help the larger community. I see children coming here to eat and play together." (Parker Decl., ¶ 7-8). "These are services that we did not have in this community before. HDV is available and providing services that are desperately needed in this community. The people at HDV open their hearts and extend their hands to help. I have seen many community members like myself come to express their support." (Parker Decl., ¶ 9). "I am an ex-addict and have been clean for 24 years. As a recovering addict, I do not frequent places where drugs are in use. I have never seen any drug activity at HDV and I would not visit nor volunteer at a place where drug use was present." (Parker Decl., ¶ 10). "Before HDV was here, this lot was full of trash and since they have been here, I have not seen trash piled up like it was before. I am very grateful for HDV, I feel safer in this neighborhood with the HDV here and I make the walk here as often as I can because I see the loving, safe, sober and supportive community here, and I want to be a part of it and do what I can to help. (Parker Decl., ¶ 11-12).

Marcia Shields is a 57-year old woman who lives across the street from HDV. (Shields Decl., ¶ 1). Since she moved into the neighborhood in 2013, the vacant lot where HDV now exists was full of trash from illegal dumping, covered in graffiti, overgrown with grass and weeds and contained "an unsightly, growing permanent mound of garbage, tires, etc." (Shields Decl., ¶ 2). According to Ms. Shields, "the volunteers at Housing and Dignity Village have transformed what was an eyesore into a clean and secure space offering sorely needed services, resources, and respite to our unsheltered neighbors. Before the Housing and Dignity Village lived on the lot, I would not walk on that side of the street because it was so unkempt and unnerving. Now, I feel safer with female neighbors residing on that plot." (Shields Decl., ¶ 4). Ms. Shields adds that "the encampment is very quiet and I appreciate it because it provides women a secure place to live. Since the encampment has been there, I have not seen

any illegal dumping in that spot.  I support all that they are doing to respond to the needs of our fellow residents in a humane and respectful way and hope to continue to help them any way I can." (Shields Decl., ¶ 5).  Ms. Shields concludes by stating that "while the City of Oakland works towards a comprehensive and permanent solution to the housing crisis and the plight of our city's most vulnerable residents, the Housing and Dignity Village sets the example for the definition of community and the role we each play in caring for one another." (Shields Decl., ¶ 6).

HDV has received letters of support from the surrounding community members and numerous community members have volunteered to work at the encampment.  (*See* letters of support and a sign in sheet for volunteers attached as Exhibit H and I to the November 21 Miralle Decl., ¶ 50).  The following elected officials have expressed their support for HDV: State Senator Nancy Skinner, Congresswoman Barbara Lee, Assemblyman Rob Bonta, Alameda County Supervisor Nate Miley, and Oakland City Councilmember Rebecca Kaplan. (November 21 Miralle Decl., ¶ 54).

**K.      The City Threatens Plaintiffs With Criminal Sanction for Sleeping on Public Property**

In nearly every communication that the City had with plaintiffs, there was an overt or implicit threat of arrest. In his October 29, 2018 email, Defendant DeVries accused plaintiffs of trespassing and of "illegal action." (Exh. B to Miralle Decl., Dkt. No. 23.) On November 6, 2018, Defendant DeVries again told the plaintiffs that their actions constituted trespassing and advised them to cease activity. (Exh. C to Miralle Decl., Dkt No. 23.) On November 7, 2018, a uniformed Oakland police officer entered the encampment and posted an eviction notice. (Miralle Decl. ¶ 4.) The notice was titled "Notice to Vacate Illegal Encampment." (Id.)

Plaintiffs believed, based on their previous experience with the OPD's enforcement of the Notice to Vacate the Marcus Garvey Village, that if they did not obey the notice, they would be arrested, cited, and/or have our shelters and property removed and destroyed. (Miralle Decl., ¶ 46).  Despite this, several residents and supporting community members were planning on refusing to vacate on November 10 pursuant to the Notice, even if it meant being arrested. (Miralle Decl., ¶ 44).

Although the City implies that the encampment residents are unwelcome in the neighborhood, the City admits that its Department of Public Works only received <u>one complaint</u> regarding the encampment at issue herein, and that this complaint consisted of an allegation that a homeless person from the

encampment had put a garbage bag on the sidewalk. (Dunlap Decl., ¶ 19, Exhibit I).[4] They present no evidence that the encampment is the subject of criminal complaints.[5]

## L.    Plaintiffs Follow the City's Directions on How to Find Shelter After Receiving the Notice but no Shelter is Available

After attempting, but being unable, to secure alternative housing options through their personal networks when served with the Notice to Vacate, the Plaintiffs called the only two phone numbers listed on the Notice.  The Notice states that "If you have any questions and/or concerns please call" these two numbers, and this is the <u>only</u> information listed anywhere on the Notice and provided to the Plaintiffs regarding any potential alternative shelter.  As outlined in detail in their declarations, when Plaintiffs called the first number, they reached a recording that instructed them to leave a message but they were unable to because "the mailbox was full."  (Brown Decl., ¶ 6-7, Johnson Decl., ¶ 5, November 11 Miralle Decl., ¶ 7, Everett Decl., ¶ 6).  When the Plaintiffs called the second number, they reached a recording that said the number "had been changed or disconnected" and "was not in service." (Brown Decl., ¶ 8, Johnson Decl., ¶ 7, November 11 Miralle Decl., ¶ 8, Everett Decl., ¶ 7, Ortega ¶ 14).  When Plaintiffs Aiyahanna Johnson and Anita Miralle asked one of the police officers who posted the Notice "where [they] could find a place to stay or who to contact if they were not able to stay here as an alternative. They told [them] to call the numbers listed on the bottom of the notice." (Johnson Decl., ¶ 5, November 11 Miralle Decl., ¶ 6).

Plaintiffs did more than just call the numbers the City provided on the Notice in their attempt to locate shelter when they were served with the Notice.  When Ms. Miralle "asked the police officers who posted the notice where [she] could find a place to stay or who to contact if [she] was not able to stay here as an alternative", "the Lieutenant who posted the notice told [her] that he was instructed to tell

---

[4] Plaintiffs hereby object pursuant to Local Rule 7-3(d)(1) to the numerous instances of hearsay, lack of foundation, lack of personal knowledge and other violations of the Rules of Evidence contained in Defendants' filings in support of their Opposition. Due to Plaintiffs receiving Defendants' voluminous Opposition at 9:42 p.m. on November 19 and being required to file their Reply two days later on November 21, Plaintiffs are unable to identify each evidentiary violation at this time but can provide this information to the Court at a later date if necessary.

[5] The City does offer the Declaration of Antonio Taylor to support its position that the plaintiffs are not desired in their community. Although he cites no specific criminal conduct, in an email to the city, he states "I do not want lawless communists in my neighborhood." He does on to say "I don't care if I have to go to jail if I have to kill a communist." (Exh. C to Taylor Decl.)

[them] that there were beds for [them] at St. Vincent DePaul." (November 11 Miralle Decl., ¶ 6). When Ms. Miralle called the number for St. Vincent DePaul at approximately 10:15 a.m. on November 10, 2018, she "was told there were no beds available at that time and [she] should call back at 4:30 . . . When [she] called back at 4:33 p.m., [she] got a voicemail saying no one was available to take the call." (November 11 Miralle Decl., ¶ 9). Plaintiff Irvin Josue Hernandez Ortega called St. Vincent DePaul on November 11, but no one answered. He left a message but was never contacted. (Ortega ¶ 14). Ms. Miralle also called the Center for Women and Children, who said they had no beds available, and the hotline for unsheltered people in Alameda County, and "was informed that there are no shelter beds available anywhere in Alameda County." (November 11 Miralle Decl., ¶ 9).

On November 20, 2018 someone from the City's Economic and Workforce Development entered the property, stating that he had a work order to repair the fence. This is the first and only City employee to visit HDV and offer any services. The City Administrator Staff and Oakland Police did not offer any services or referrals for available shelters beds at any time, including in connection with the Notice to Vacate. (November 21 Miralle Decl., ¶ 51-52).

**M.    Plaintiffs Have Maintained the Status Quo as Directed by the Court**

The Village and Plaintiffs have fully complied with the Court's November 13, 2018 order to maintain the status quo. (November 21 Miralle Decl., ¶ 46). At the time that the Notice to Vacate was posted on November 7, 2018 the HDV consisted of one camper, several structures and tents, and all the service booths, including the donation tent. (November 21 Miralle Decl., ¶ 45). Although four senior citizen women and several women with families have expressed interest in moving into HDV, Plaintiffs have complied with the Court's Order and we have not allowed anyone else to move into the encampment. The same 13 persons identified to the Court are still the only residents at HDV. As a community service hub, we do open our doors and regularly welcome our neighbors and people who come by to obtain services or express their support, however no additional persons have moved in to live at the HDV since November 13, 2018. (November 21 Miralle Decl., ¶ 48-49). Plaintiffs have not constructed any additional structures or added any additional tents since November 10, 2018. Preparing for the upcoming rain this week, Plaintiffs have been working to weather-proof the existing structures, which includes placing tarps on tents and structures, lifting tents off the ground using palates, and

moving canopies over tents.  Plaintiffs also reorganized the space, moving several tents to separate the

living areas from the community service areas, but have not added any additional tents or structures.

(November 21 Miralle Decl., ¶ 50).

## III.    ARGUMENT

### A.    Plaintiffs Are Entitled to a Preliminary Injunction

Plaintiffs are entitled to a preliminary injunction where they establish (1) a likelihood of success

on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance

of equities tips in the plaintiffs' favor; and that (4) preliminary relief is in the public interest. *Vivid*

*Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014); *Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008).  "In each case, courts 'must balance the competing claims of injury and must

consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S

at 24, *quoting Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987).  Importantly, plaintiffs need

not show that they will prevail at trial, but only that they are "likely" to prevail. *Winter*, 555 U.S. at 20.

The four-part test is satisfied if "serious questions going to the merits [are] raised and the balance

of hardships tips sharply in the plaintiff's favor" so long as there is also a likelihood of irreparable harm

and an injunction would be in the public's interest. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127,

1134-35 (9th Cir. 2011) (citation and internal marks omitted); *see also Shell Offshore, Inc. v.*

*Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).  A "serious question" is one on which the movant

"has a fair chance of success on the merits." *Sierra On- Line, Inc. v. Phoenix Software,* Inc., 739 F.2d

1415, 1421 (9th Cir. 1984). In this instance, all four factors support the requested injunction and there is,

at a minimum, a "serious question" on which Plaintiffs have more than a "fair chance" to succeed on the

merits.

### 1.    Plaintiffs Have a Likelihood of Success

#### a.    Plaintiffs Have Standing

To establish Article III standing, a plaintiff must show (1) an "actual or imminent" injury (2) that

is "fairly traceable to the challenged action" and (3) "redressable by a favorable ruling." *See Susan B.*

*Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398

(2013); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The Ninth Circuit recently

confirmed that plaintiffs have standing to pursue injunctive relief in a challenge of city ordinances

criminalizing people for being homeless because they faced a "credible threat [or "risk"] of prosecution."

*Martin v. City of Boise*, 902 F.3d 1031, 1040-1042 (9th Cir. 2018); *see also Jones v. City of Los Angeles*,

444 F.3d 1118, 1126-1127 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007) (plaintiff need only

show an "actual or threatened injury . . . he need not show that such recurrence is probable.").[6]

Moreover, defendants in these situations have a "heavy burden" of demonstrating that the challenged

conduct "could not reasonably be expected to occur. *Martin*, 902 F.3d at 1040-1041, citing *Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610

(2000)).

    As the Supreme Court recently explained in *Driehaus*, a conviction is not required for standing to

challenge the constitutionality of a criminal statute: "One recurring issue in our cases is determining

when the threatened enforcement of a law creates an Article III injury. When an individual is subject to

such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to

challenging the law . . . [a plaintiff] should not be required to await and undergo a criminal prosecution

as the sole means of seeking relief." *Driehaus*, 134 S. Ct. at 2342-43; *see also Martin*, 902 F.3d at 1045

(rejecting the argument that a conviction is required for standing)[7]; *Jones,* 444 F.3d at 1130 ("a

conviction is not required to establish standing for prospective relief from enforcement of a criminal law

against a status or behavior that may not be criminalized under the Eighth Amendment."); *see also Lehr*

---

[6] The Circuit directed entry of a preliminary injunction in *Jones*, suspending night time enforcement of a Los Angeles ordinance that prohibited sitting, lying, or sleeping on all public streets and sidewalks at all hours and locations. *Jones*, 444 F.3d at 1136–1138. The injunction was to remain in effect so long as there was inadequate shelter available for unhoused persons. *Id.* Although the Circuit opinion in *Jones* was vacated on settlement for reasons unrelated to the merits and, therefore, is not binding precedent, the Ninth Circuit in *Martin* held that Boise's actions were unconstitutional "for essentially the same reasons articulated in the now-vacated *Jones* opinion." *Martin*, 902 F. 3d at 1046. Moreover, this Circuit has repeatedly confirmed that "at minimum, a vacated opinion still carries informational and perhaps even persuasive or precedential value . . . [and that] "until contrary authority is decided," a vacated opinion is "likely to be viewed as persuasive authority if not the governing law of the ... Circuit." *See DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1175–1176 (9th Cir. 2005) (Beezer, J., concurring) (internal citations and quotations omitted); *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 (9th Cir. 2014) (following as persuasive authority a decision vacated on collateral estoppel grounds).
[7] The "cruel and Unusual Punishments Clause . . . . imposes substantive limits on what can be made criminal and punished as such. This latter protection governs the criminal law process as a whole, not only the imposition of punishment postconviction." *Martin*, 902 F.3d at 1045.

*v. City of Sacramento*, 624 F. Supp. 2d 1218, 1225-1226 (E.D. 2009) ("a conviction is not required to

establish standing for prospective relief from enforcement of a criminal law against a status or behavior

that may not be criminalized under the Eighth Amendment").[8] This is particularly applicable here, where

it would be nonsensical to require that Plaintiffs stay in their current location and be subjected to citation

and/or arrest in order to challenge the constitutionality of the City's ability to cite or arrest them.[9]

The Ninth Circuit has also held that sufficient pre-citation law enforcement activities include

being "ordered to move." *Jones,* 444 F.3d at 1125; *see also Lehr v. City of Sacramento*, 624 F. Supp. 2d

1218, 1220 (E.D. Cal. 2009).  This principle was recently reaffirmed in *Sturgeon v. Masica*, challenging a

law creating a hovercraft ban over the Alaska river. The Court held that the Plaintiff satisfied the injury-

in-fact requirement because he was (1) verbally warned by a National Park Service ranger not to use his

hovercraft, (2) asked to leave, and (3) told he "[might] be subject to criminal liability" if he was caught

doing it again. 768 F.3d 1066, 1072 (9th Cir. 2014) (*relying on Susan B. Anthony List*, 134 S. Ct. at

2342), vacated and remanded on other grounds, *Sturgeon v. Frost*, 136 S.Ct. 1061 (2014)).

As outlined in detail in the Statement of Facts, Plaintiffs in this case have standing because they

face a threat or risk of prosecution based on the Notice to Vacate's language referring to their

encampment as "illegal", Devries' accusations of trespassing and the City's well documents history of

arresting, citing or threatening to arrest homeless people in connection with the posting of notices to

evict.  Plaintiffs satisfy the other prongs of the standing test as well. Their injuries are "fairly traceable"

to the threatened and actual enforcement actions of the Defendants and Plaintiffs' injuries would be

redressable by a favorable decision.

/ / /

/ / /

---

[8] The Ninth Circuit held in *Martin* that plaintiffs had standing even where "the record suggests there is no known citation of a homeless individual under the Ordinances for camping or sleeping on public property on any night or morning when he or she was unable to secure shelter due to a lack of shelter capacity" *Martin*, 902 F.3d at 1039-1040 (internal quotations omitted).

[9] The threat of citation is also sufficient to confer standing.  *See e.g. Joyce v. City & County of San Francisco*, 846 F. Supp. 843, 854 (N.D. Cal. 1994) (holding that plaintiff who had "paid a fine imposed by citation" had standing. [F]ines . . . traditionally have been associated with the criminal process' . . . ." (quoting *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)) ,*vacated as moot*, No. 95-16940, 1996 WL 329317 (9th 1996).).

**b.**     **Plaintiffs Have Raised Serious Questions Regarding the Merits of Their**

**Eighth Amendment Claim**

The Ninth Circuit recently held in *Martin v. City of Boise* that when its residents "have no home or other shelter to go to," a city may not criminalize them "for sleeping outside on public property." *Martin*, 902 F. 3d at 1035.  A careful application of the holding in *Martin* to the instant case confirms that the doctrine developed by this Circuit in *Martin* should apply here for the following reasons.

i.     The Homeless Crisis in Oakland is Much Worse Than the Situation in *Martin*

The Ninth Circuit decisions in *Martin* and *Jones* both relied on the fact that there were more homeless people than shelter beds available for them. *Martin*, 902 F.3d at 1036-37; *Jones,* 444 F. 3d at 1138 (holding that the Los Angeles could not enforce ordinance against homeless individuals "so long as there is a greater number of homeless individuals in in Los Angeles than the number of available beds [in shelters].").  Moreover, the court in *Martin* explained that the availability of shelter analysis is based on shelter beds that are "practically available," and that limitations on the availability of shelters, including the time limits they impose on the length of stays and the requirements of participation in religious programs to receive shelter, are all relative to the assessment of whether a shelter bed is "available." *Martin*, 902 F. 3d at 1041-1042, 1049; *see also Jones,* 444 F. 3d at 1131 (relying in part on the "practical realities of homelessness" to find the statute at issue in that case unconstitutional).

There are approximately 14,000 people sleeping on public property every night in Oakland and only 460 of shelter beds.  In stark contrast, as outlined in the *Martin* decision, while there were only 46 "unsheltered" homeless people in 2014, and 125 in 2016 (in Ada County, not even the city of Boise itself), "Boise's three homeless shelters contain 354 beds and 92 overflow mats for homeless individuals." *Martin*, 902 F.3d at 1037.  In this case, although Defendants claim that there are shelter beds available for the Plaintiffs, not only is this claim contradicted by the huge number of homeless people and scarcity of beds but, as outlined in detail above, the Plaintiffs were unable to locate other shelter despite the fact that they not only followed the City's direction on the Notice to Vacate and the instructions given to them by the OPD officers who posted the Notice, but made a number of additional attempts to secure shelter when they received the Notice but were unsuccessful.  There was, and is, nowhere else for them to go.

The fact that the disparity between the significant number of homeless people in Oakland and the extremely limited number of sheltered beds available is <u>much</u> greater here than it was in Boise at the time period addressed in *Martin*, confirms that the homeless crisis at issue in this case is much more dire and compels an even closer analysis of the City's actions here. Because Plaintiffs in the instant case are facing substantially more challenges to escaping homelessness, there is an even greater need to not criminalize them for being homeless, which provides further support for the limited relief sought herein.

ii. <u>Plaintiffs Are Being Threatened with Criminal Sanction for Sleeping on Public Property Just Like in *Martin*</u>

In *Martin*, the Ninth Circuit held that the plaintiffs "faced a credible threat of prosecution" sufficient to find the City's actions unconstitutional even though Boise amended the ordinances at issue in 2014 to mandate that they not be enforced "when the individual is on public property and there is no available overnight shelter," and "there is no known citation of a homeless individual under the Ordinances for camping or sleeping on public property on any night or morning when he or she was unable to secure shelter due to a lack of shelter capacity." *Martin*, 902 F.3d at 1039-140 (internal citations omitted).

In contrast, Plaintiffs here face much more concrete threats of criminal sanction. First, as outlined in detail in the Statement of Facts, the Notice that was posted by three OPD officers is entitled "Notice to Vacate *Illegal* Encampment" (emphasis added), Defendant Devries' emails to Plaintiff Miralle accuse her of "illegally enter[ing] city property" and threaten her by stating that he is "put[ing] you on notice that this is trespassing" and that she has engaged in "an illegal action." (Exhibit B to the first Miralle Decl.). But the City did not stop there. In its Opposition, it repeatedly refers to Plaintiffs' criminal conduct, including that "[a]ll of the actions that Plaintiffs have engaged in . . . are illegal." (Opposition, p. 4). This is more than sufficient to establish that Plaintiffs are being subjected to a threat of criminalization for sleeping on public property.[10] Moreover, if for some reason this is not a sufficient threat of criminal

---

[10] Plaintiffs herein make an as-applied challenge to Defendants' attempts to criminalize their conduct, which does not require a plaintiff to show that application of the challenged law is facially unconstitutional—the law may be constitutional in some or even most applications. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another."). Accordingly, to sustain an as-applied challenge, a court need not find that a challenged law is unfairly written, or strike down the law

sanction, does that require the Plaintiffs to remain in the location through the eviction process if their request for a preliminary injunction is denied so that it can be confirmed that they will be subjected to criminal sanction? That is exactly the kind of unpredictable and dangerous situation the Plaintiffs are trying to avoid by filing this case.

Although Defendants now appear to claim in their Opposition that the only criminal action they would bring against the Plaintiffs is based on "illegal trespassing," this is belied by the City's longstanding pattern and practice of threatening, citing and/or arresting homeless people for sleeping in public under other, non-trespassing statutes or ordinances. The fact that if Plaintiffs were to leave their current location and return to the street or a park they would still be subjected to the initiation of criminal proceedings based on the City's repeated ticketing and arresting of other homeless individuals sleeping on the street or in parks provides further evidence that this situation falls within *Martin's* prohibition of criminal penalties for being homeless. "As long as the homeless plaintiffs <u>do not have a single place where they can lawfully be</u>, the challenged ordinances, <u>as applied to them</u>, effectively punish them for something which they may not be convicted under the Eighth Amendment – sleeping, eating and other innocent conduct." *Martin*, 902 F. 3d at 1048 (emphasis added, internal quotation omitted); *see also Pottinger v. City of Miami*, 810 F. Supp. 1551, 1580 (S.D. Fla. 1992) ("plaintiffs have no place where they can be without facing the threat of arrest").

Is the City's position that if the Plaintiffs moved to the sidewalk immediately outside the fence surrounding the vacant, publicly owned lot they currently reside in, blocking the sidewalk and arguably having an even greater negative impact on the surrounding community, the Plaintiffs would not be cited or arrested? As the Ninth Circuit stated in *Jones*, "[i]f there is no offense for which the homeless can be convicted, is the City admitting that all that comes before is merely police harassment of a vulnerable population?" *Jones*, 444 F. 3d at 1131.

Moreover, citing or arresting Plaintiffs for trespassing under California law would still bring this case within the scope of the holding in *Martin* because one of the statutes found unconstitutional as applied to the homeless plaintiffs in *Martin* is strikingly similar to California's trespass statute. While the

as a whole but may instead enjoin application of the law in the "particular circumstances" raised by the plaintiffs. *Id.* at 328–29.

ordinance in *Martin* prohibited "[o]ccupying, lodging, or sleeping in any building, structure or place, whether public or private without permission" *Martin,* 902 F. 3d at 1049 (internal quotations omitted), the California statute against trespassing prohibits people from "entering and occupying real property . . . without the consent of the owner." Cal. Penal Code § 602(m). As a result, citing or arresting the Plaintiffs for trespassing for sleeping in a City owned abandoned lot would represent the same punishment of sleeping in public "that is an unavoidable consequence of being human and homeless" that the Ninth Circuit found to be unconstitutional in *Martin* and *Jones.*

Furthermore, citing or arresting Plaintiffs for trespassing in this unique set of circumstances (the huge disparity in the numbers of homeless people and the available beds, sleeping in a City owned lot that has been vacant, undeveloped and abandoned for 10 years, etc.) brings this situation within *Martin*'s prohibition of criminal sanction against homeless people for having to sleep in public when there is nowhere else to go. *Martin*, 902 F.3d at 1048. The City should not be allowed to circumvent the dictates of *Martin* and engage in the unconstitutional criminalization of people for being homeless by threatening, citing or arresting Plaintiffs for trespassing when their real violation is sleeping on public property when they have nowhere else to go.

iii. <u>Plaintiffs Are Being Forced to Sleep on Public Property Just Like in *Martin*</u>

The City cannot avoid the constitutional violation affirmed in *Martin* just because the Plaintiffs are sleeping on a publicly owned lot that has been vacant and abandoned for the last ten years as opposed to a public sidewalk or park. As outlined in detail in Defendants' Opposition, the City owns the property that the Plaintiffs currently live on. (Opposition, p. 9). This City owned property used to contain a liquor store but the City demolished the liquor store and "completely cleared" the property in 2008. *Id.* The property has not been developed in any way since 2008, and it currently consists of an asphalt former parking lot and a grassy area. (Dunlap Decl., ¶ 15). Although the City references a proposal to build a nursing facility on the sight, that was from 2009 and not only was that facility never built but the City is unable to identify <u>any</u> information regarding <u>any</u> proposed use for this property since 2009, and it has stood vacant and unused as the number of homeless people in Oakland and the surrounding neighborhood has increased exponentially.[11] Criminally sanctioning Plaintiffs for trespassing on this City owned

---

[11] Not only is it important to note that there were and remain a significant population of homeless people

vacant lot is analogous to the City citing or arresting someone for trespassing when they are sleeping in a City park after it is closed, as the City closes all of its public parks at either dusk or 9 p.m.[12]  It cannot be the case that one of those actions is unconstitutional and the other is not.

The fact that this is a City-owned property further distinguishes this case from the pre-*Martin* decision relied on by Defendants in *Sullivan v. City of Berkeley*, No. C 17-06051 WHA 2018 U.S. Dist. LEXIS 164686 (N.D. Cal. October 31, 2017).  In *Sullivan,* the court based its order, at least in part, on the fact that the property at issue in that case was not "city property" like the property at issue in *Martin, Jones* and the instant case but instead is a "transit district" owned by BART. *Id.* at *10.  The court pointed out that this "is an important distinction because, unlike a city, a transit district is not as equipped to remedy the problems associated with homelessness.  Clearly, BART is not equipped to provide shelter or housing aid.  Requiring that it nevertheless host a homeless encampment on its property would far exceed its statutory authorization." *Id.* at *10.

Finally, the Plaintiffs only entered the current location after the City evicted them from their previous encampment in a public park in February 2017 and, despite repeated claims that they would find a suitable location for the Village (and even being directed to do so by the City Council in September 2017, *see* second Miralle Decl., ¶ 16-18), the City has failed to provide them with a site for almost two years.  The City should not be allowed to violate Plaintiffs' constitutional rights because they are sleeping in an undeveloped, publicly owned lot that has not been used in ten years rather than in the street or in a park.  The City cannot escape the *Martin* doctrine based on which type of undeveloped and uninhabited public property the plaintiffs are forced to sleep in.

iv.  <u>Plaintiffs in This Case Seek Much More Limited Relief Than in *Martin*</u>

Finally, the relief sought herein is much more narrow and limited than the broad finding of unconstitutionality at issue in *Martin* and *Jones*.  Although Plaintiffs request that a preliminary injunction be issued that would allow them to establish a permanent encampment at their current location, they also

---

in this neighborhood both before and after the Plaintiffs moved onto the property, but it is also important to note what the Plaintiffs have <u>not</u> done at this location.  In addition to maintaining the status quo since November 13 as ordered by the Court, their use of the City owned abandoned lot has not involved the destruction of any property and does not obstruct the street or sidewalk.

[12] *See* http://www2.oaklandnet.com/oakca1/groups/opr/documents/memorandum/oak046388.pdf

request, in the alternative, and based on the City's repeated claims that it has been working to identify an appropriate encampment site for the Plaintiffs, a more narrow order allowing the residents of this encampment to be allowed to stay until a suitable location for their encampment can be found.[13]

**c.** **Plaintiffs Have Raised Serious Questions Regarding the Merits of Their Fourteenth Amendment Claim for Violation of Due Process**

i. Procedural Due Process

When the City of Oakland clears an encampment, it has a pattern and practice of "unlawfully seizing and destroying personal property that is not abandoned without providing any meaningful notice and opportunity to be heard." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012) (internal quotations omitted). The City provides a single Notice to Vacate that is lacking any information on retrieval of property purportedly stored by the City. (Exh. C to Dunlap Decl., Dkt No. 35-2.) Following the provision of the insufficient notice, the City engages in on-site destruction of property depriving homeless residents any meaningful opportunity to argue against its taking. (Hernandez Decl. ¶¶ 4, 8, 11; Ewing Decl. ¶¶ 3-4; Hansen Decl. ¶ 8; Blum Decl. ¶¶ 13-14; Semien ¶¶ 6-7; Opdyk-Orthmeyer Decl. ¶¶ 13.)

If the City is permitted to come to the HDV to evict its residents, the City will likely continue its practice of destroying any property that the plaintiffs are not able to remove or are not present to remove.

ii. The City Does Not Provide Adequate Notice To Residents Before Removing Their Property.

"As we have repeatedly made clear, '[t]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking.'" *Lavan*, 693 F.3d at 1032 (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir.2008). When the City takes a homeless residents property, the City must "take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999). *See also Lavan*, 693 F.3d at 1032. The City of Oakland fails to do this.

---

[13] As a result of this more narrow request for relief, the City's citation to *Sullivan v. City of Berkeley*'s conclusion that "court approval to settle *indefinitely* on the land of a municipal transportation district – would be *unprecedented*" (Opposition, p. 18), should be disregarded.

The City of Oakland provided Plaintiffs with a Notice to Vacate the location of their

encampment. (Exh. A to Mot. for Prelim. Inj., Dkt No. 3)[14] The Notice to Vacate informs the residents

that "any property left at this site at the time of cleanup will be removed from the site and stored by

public works." (Exh. A to Mot. For Prelim. Inj, Dkt No. 3.) It goes on "[p]roperty that is unsafe or

hazardous to store will be immediately discarded." (Id.) The notice does not inform residents how they

may get their property back from the Department of Public Works. Further, it does not define what

materials are unsafe or hazardous.[15]

The Notice provided to Plaintiffs included a single working phone number and an additional non-

working phone number that persons were directed to call with "questions and/or concerns." (Exh. A to

Mot. For Prelim. Inj., Dkt No. 3; DeVries Decl. ¶ 25, Dkt No. 35-1.) The single working phone number

leads to a voicemail that is frequently full. (DeVries Decl. ¶ 25, Dkt No. 35-1.)[16] The notice provided to

plaintiffs, like the template used by the Department of Public Works, does not include information about

how a person may be able to access services or retrieve property that is taken by the City. (Exh. A to

Mot. For Prelim. Inj., Dkt No. 3; Exh. C to Dunlap Decl., Dkt No. 35-2.)

In their Opposition, the City said that when it clears an encampment, it posts a Notice to Vacate

prior to clearing an encampment, and a Notice of Collected Property following its collection of any

property to be stored by the Department of Public Works. (Dunlap Decl. ¶¶ 11, 14, Dkt No. 35-2.) In

practice, the City does not post the Notice of Collected Property at the site of the cleared encampment

and therefore the information about how to retrieve property, if any property has indeed been stored, is

not disseminated to the homeless encampment residents. (Hernandez Decl. ¶ 13.)

Plaintiffs received a Notice to Vacate. (Exh. A to Mot. For Prelim. Inj., Dkt No. 3.) However, the

Notice to Vacate is insufficient to provide Plaintiffs constitutionally adequate notice. This notice, which

---

[14] The Notice provided to plaintiffs is different than the Notice template used by the Department of
Public Works. (*Compare* Exh. A to Mot. For Prelim. Inj, Dkt No. 3 *with* Exh. C to Dunlap Decl., Dkt No.
35-2.)

[15] The City's guidelines for property identification provided by the City instructs City workers to discard
bedding and sleeping bags, pots and pans and books, describing them as unsafe to store. (See Ex. B to
Dunlap Decl., Dkt No. 35-2.) This forces residents whose property is taken to sleep outdoors with not
even a blanket between them and the elements. (Hernandez Decl. ¶ 12.)

[16] Only one plaintiff was able to leave a voicemail. (Hernandez Decl. ¶ 12, Dkt No. 26.) He left a
message on November 11, 2018. As of November 15, 2018, when his cell phone was turned off because
he could not pay the bill, his call has not been returned. (Hernandez Decl. ¶ 14.)

amounts to the only notice that the encampment can expect to receive, does not explain to residents how they can retrieve their property. (Id.)

In practice, the Notice of Collected Property is never posted, and homeless residents are not notified about where they may go to get their belongings that may have been stored by the City. Plaintiff Irvin Hernandez has never seen a Notice of Collected Property, despite having his property taken by the City at least 10 times in the five years that he has been homeless. (Hernandez Decl. ¶¶ 2, 13.) By providing only the information contained in the Notice to Vacate, the City's notice does not meet the rigors of due process.

While the Court in *Lavan* did not prescribe exact language to be included in a constitutionally adequate notice, the Court provided guidance by determining what notice was inadequate. Prior to the seizures at issue in *Lavan*, the City of Los Angeles posted signs throughout the area where plaintiffs and the putative class resided which stated:

> "Los Angeles Municipal Code section 56.11 prohibits leaving any merchandise, baggage or personal property on a public sidewalk. The City of Los Angeles has a regular clean-up of this area scheduled for Monday through Friday between 8:00 and 11:00 am. Any property left at or near this location at the time of this clean-up is subject to disposal by the City of Los Angeles."

*Lavan*, 693 F.3d at 1033-34 (Callahan, J. Dissenting.). This court found that this posted sign did not satisfy the notice required before property could be taken. *Id.* at 1032-1033. To remedy the inadequate notice, the district court directed the defendants to "'leave a notice in a prominent place for any property taken on the belief that it is abandoned, including advising where the property is being kept and when it may be claimed by the rightful owner." *Id.* at 1025 (quoting *Lavan v. City of Los Angeles*, No. 11–CV–2874, 2011 WL 1533070, at *7 (C.D.Cal. Apr. 22, 2011). The Ninth Circuit did not disturb the lower court's requirement. *Id.* at 1032-33.

The City of Oakland's Notice to Vacate does not describe where a person's property may be stored or how to retrieve it. (Exh. A to Mot. For Prelim. Inj., Dkt No. 3.) Even the Notice of Collected Property, were it ever posted, fails to include the location of the property and instead relies on the homeless resident having access to a phone to call for property retrieval. (Exh. E to Dunlap Decl., Dkt

No. 35-2.)[17] The City fails to provide residents with adequate notice before depriving them of their property.

### iii. The Plaintiffs' Property Will Be Destroyed And They Will Have No Meaningful Opportunity To Argue Against Its Destruction.

Even were the City to provide adequate notice through its Notice to Vacate and its Notice of Collected Property, the City engages in on-site destruction of property that denies plaintiffs their right to retrieve their belongings. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Where a City engages in on-the-spot destruction of a homeless person's property, it denies the homeless individual their procedural right to argue against its taking. *Lavan*, 693 F.3d at 1032–33 (concluding that the City's practice of on the spot destruction of property does not afford homeless residents the necessary due process protections of the Fourteenth Amendment).

When the Oakland Police Department and Department of Public Works arrive to clear an encampment, they dispose of all property present, often using machinery and a trash compactor to accomplish this task. (Hernandez Decl. ¶ 8; Ewing Decl. ¶¶ 3-4; Hansen Decl. ¶ 8; Blum Decl. ¶¶ 13-14; Semien Decl. ¶¶ 6-7; Opdyk-Orthmeyer Decl. ¶¶ 13.) The Village has been previously destroyed using these very tactics. (Miralle Decl. ¶¶ 9-12.)

Plaintiff Hernandez's belongings have been discarded by the City of Oakland on many occasions. (Hernandez Decl. ¶¶ 2, 4, 8, 11.) He watched as City workers threw his shelter and belongings in a trash compactor. (Id. ¶ 8.) His shelter from the elements, state identification, work uniform, and clothing have all been disposed of by the City during evictions. (Id. ¶¶ 4, 9.) This practice is common. Homeless resident Dawn Michelle Opdyk-Orthmeyer had "everything I needed to survive" destroyed in a trash compactor, including her clothes and kitchen set-up. (Opdyk-Orthmeyer Decl. ¶¶ 13.) The City even took a box of gifts for her children. (Id.) Homeless resident Donna Lee Ewing received a notice from the City of Oakland last year instructing her to vacate from her location at Union

---

[17] As demonstrated by the testimony of Plaintiff Hernandez, access to services solely through the use of a phone can be a barrier to a person who is unhoused. (Hernandez Decl. ¶ 14.)

Point. (Ewing Decl. ¶¶ 2-3.) When she did not move, the City came to enforce their notice and threw her belongings away. (Id. ¶ 4.) Homeless resident Lucille Pereira Brum has lost her identification, money, tents, bicycles and other property when the City has enforced an encampment closure against her. (Blum Decl. ¶ 13-14.)

In addition, the City uses heavy machinery to remove property and places property in a trash compactor thus assuring its total destruction. Homeless resident Edward George Hansen has watched as the City arrives with a front loader tractor or other "machine with big jaws" to use when grabbing and throwing the belongings of homeless residents into a trash compactor. (Hansen Decl. ¶ 8.) He has not seen the City come with any flat bed trucks suitable for transporting property to store. (Id.) Homeless resident Stephanie Ann Semien has also seen the use of these machines to dispose of property. (Semien Decl. ¶ 6.) As a result of the City's encampment clearing, she had lost her tent, clothing, bedding, shoes, and important papers. (Semien Decl. ¶ 7.)

This on-site destruction of a homeless resident's belongings is precisely what the court in *Lavan* warned against. 693 F.3d at 1032–33. The City's practice of on-site and indiscriminate destruction of homeless residents' property violates the procedural due process rights of Oakland's homeless residents. The residents at HDV are in immediate risk of having their property, including their shelter and protection from the elements, permanently destroyed. Plaintiffs and residents of the HDV will be subject to the same due process violations as they have experienced in the past experienced and as other homeless individuals in Oakland have experienced if the Court does not enjoin the City from carrying out the encampment eviction.

iv. <u>The City Is Deliberately Indifferent To The Danger To Which It Will Subject Plaintiffs If It Evicts Plaintiffs From Their Encampments.</u>

The City's proposed closure of Plaintiffs' encampment during the winter months, without promise of adequate shelter or a safe and sanitary place to reside places plaintiffs in a more dangerous condition than when the City found them. The Notice to Vacate provided to the encampment also comes with the threat that plaintiffs' tents and structures will be demolished and they will be forced to camp exposed to the elements. (Miralle Decl. ¶¶ 9-12; Hernandez Decl. ¶¶ 4, 8, 11.) This affirmative action by the City to expose plaintiffs to the known dangers of street encampment living and living without shelter in winter

months violates plaintiffs' substantive due process rights. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201) ("It is [] well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced.") A plaintiff's right to be free from such state-created danger protects her from a city's effort to close an encampment and dismantle shelters. *See, e.g.*, *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012) (addressing a homeless plaintiffs' substantive due process right to be free from the state's proposed action to demolish his shelter at the onset of winter weather).

Plaintiffs are individuals experiencing chronic homelessness who camp together in a clean and sober intentional community. (Miralle Decl. ¶ 38.) At the location of their current encampment, they have a fence that they can lock at night, which protects them from people who might otherwise take advantage of homeless residents. (Id. ¶ 39.) They host services for the encampment residents and the housed and unhoused community including service of breakfast and dinner four nights a week, access to a private composting toilet, access to religious and spiritual services, and medical care. (Id. ¶ 40.) They have shelters that they have erected that provide meaningful escape from the cold and rain. (Miralle Decl. ¶45.) When the Oakland Police Department noticed the City's intent to clear the encampment on November 7, 2018, it left only a Notice to Vacate, which told plaintiffs to leave but offered them nowhere to go, even for a night. (Exh. A to Mot. For Prelim. Inj, Dkt No. 3.)

Plaintiffs are clear about the danger they face if the City forces them to vacate the encampment. "If plaintiffs are forced to move, homeless people and their homeless families who have no alternative shelter to meet their needs would be forced into the elements and to unsafe streets with out safe shelter." (Compl. At 5, Dkt No. 1.) The elements in the City of Oakland at the filing of this Reply include frigid winter temperatures and heavy rains. As recently as the day prior to the filing, the city suffered dangerously unhealthy air quality, forcing those with the privilege of shelter to remain inside as mush as possible.

The Ninth Circuit in *Kennedy* created a two-part test for substantive due process claims,

"requiring: (1) official (state) action that affirmatively placed an individual in danger; and (2) deliberate indifference to that danger." *Sanchez*, 914 F. Supp. 2d at 1102. "'In examining whether an officer affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [should it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court must] examine whether the officer left the person in a situation that was more dangerous than the one in which they found him.'" *Id.* (quoting *Kennedy*, 439 F.3d at 1062).  Further, "a court 'must decide the related issues of whether the danger to which' the defendant exposed plaintiff 'was known or obvious, and whether [defendant] acted with deliberate indifference to it.'" *Id.* (quoting *Kennedy*, 439 F.3d at 1064).

Here, the City is taking affirmative steps to place the plaintiffs in danger by evicting them from land where they have a safe intentional community and shelter from the weather and dangerous air quality. The City is forcing plaintiffs to move anywhere else in the City where they will not have shelter, safety or the ability to camp together in their sober intentional community.

Further, the City is aware of the dangers faced by homeless individuals living without shelter. In its resolution declaring a shelter crisis, the City acknowledged that

> "unauthorized homelessness encampments . . . expos[e] homeless individuals to traffic hazards, increased vulnerability to crime, risk of death and injury, exposure to weather, lack of adequate sanitation and debris services and other conditions that are detrimental to their health and safety."

(Exh. 1 to Request for Judicial Notice, Dkt. No. 28) Despite the efforts of plaintiffs to use community resources to build shelter, access sanitation, and create hot, healthy meals in a manner the mitigates the risks known to exist for homeless residents of Oakland, the City intends to force the plaintiffs into the unsafe and uncertain conditions of the streets. (Exh. A to Mot. For Prelim. Inj, Dkt No. 3.)

This case is analogous to the *Sanchez* case in Fresno. There, a homeless plaintiff was living in a small shelter in a homeless community. 914 F. Supp. 2d at 1093. In the month of September, the City of Fresno "set in motion a plan to eradicate a number of small shelters used by homeless individuals in an area in the City." *Id.* The plaintiff alleged that the City was aware the shelters were used by homeless residents as protection from the elements and as one would otherwise use a home, to store belongings and personal property. *Id.* The plaintiff alleged that he had no other means of sheltering himself or protecting

himself from the elements, and "that no safe shelter was available to [him] or to large numbers of other homeless residents." *Id.* Finally, the plaintiff alleged that the City was aware of these conditions and that the frigid winter temperatures were known or obvious to the City. *Id.*

The court in *Sanchez* considered the allegations of an affirmative action by the City--the planned demolition of structures that were otherwise keeping the homeless residents safe from the winter weather and "other difficult physical conditions"--and the allegations that the City knew or should have known that their actions threatened the survival of the plaintiff and others similarly situated, and determined that the plaintiff could proceed with his substantive due process claim. *Id.* at 1102.[18]

Plaintiffs here face precisely the same situation as the plaintiff in *Sanchez*. In the dead of winter, the City wants to demolish the structures the currently keep plaintiffs safe from the elements. At the location in which they reside, they have shelter that protects them from the weather and from the dangers of living in street encampments. (Miralle Decl. ¶ 45.) Although the City says that shelter is available, the shelter is not accessible, as demonstrated by plaintiffs' efforts to contact the organizations they were instructed to contact. (Miralle Decl. ¶¶ 6-9, Dkt No. 23; Johnson Decl. ¶¶ 4-7, Dkt No. 24; Brown Decl. ¶¶ 7-8, Dkt No. 25; Everett Decl. ¶ 5-7, Dkt No. 27.) Plaintiff Miralle was affirmatively informed that there were no beds available at shelter run by St. Vincent de Paul, despite the City insisting that there were beds available. (Compare Miralle Decl. ¶ 9, Dkt no. 23 with Bova Decl. ¶ 12.)

The City's proposed plan of removing residents and demolishing their shelter from the winter weather in the month of November, where there is no meaningful access to shelter and inherent and acknowledged dangers associated with sleeping in the streets exposes plaintiffs to a danger that this Court should not tolerate.

/ / /

## 2.    Plaintiffs Will Suffer Irreparable Harm Without an Injunction

Absent the Court's intervention, Plaintiffs will suffer irreparable harm from Defendants' criminal

---

[18] At least one other court acknowledged that the state may create an unconstitutionally dangerous situation by forcing homeless residents out of structures in winter months. *See Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (explaining that the court could not allow plaintiffs to advance their substantive due process claims because their complaint lacked "allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population.").

sanctions against them for sleeping outdoors on public property when there is no alternative shelter available in violation of their constitutional rights. This is particularly applicable where, as here, the Plaintiffs are being removed from a relatively safe place and sent back out onto the streets with winter around the corner. As the panel noted in *Lavan*, homeless persons are particularly vulnerable and the loss of personal items can be "devastating" for them. *Lavan*, 693 F.3d at 1032 (citing *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D.Fla.1992)).

Moreover, courts have repeatedly held that "An alleged constitutional infringement will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (internal citation omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"); *Nelson v. Nat'l Aeronautics & Space Admin.,* 530 F.3d 865, 882 (9th Cir. 2008)("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *reversed on other grounds and remanded*, 562 U.S. 134 (2011). Critically, the harm that these Plaintiffs will suffer if the Defendants are allowed to evict them from their current encampment is much greater than an academic constitutional violation.

There is no reasonable countervailing interest of Defendants' that outweighs the dire impact on Plaintiffs from the loss of a place to sleep. Plaintiffs are homeless, destitute and suffer from psychological, medical and physical disabilities. The inability to rest and sleep is "devastating" and clearly constitutes irreparable harm. *Jones*, 444 F.3d at 1137. Moreover, the harm to Plaintiffs is not merely speculative and is likely to continue absent the requested injunction. *Alliance for the Wild Rockies*, 632 F.3d at 1135.

> **3.** **The Balance of Equities is in Plaintiffs' Favor and an Injunction is in the Public Interest**

When an injunction is sought against the government, these two prongs of the standard for preliminary relief can be considered together. *Ariz. Dream Act Coal. v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2016) (analyzing both public interest and equities factors simultaneously). Courts have repeatedly recognized the public interest in upholding the Constitution. *See e.g. Melendres*, 695 F.3d at 1002 ("It is always in the public's interest to enjoin actions that violate an individual's constitutional rights, all the

more so when this is being done in the name of their own government."); *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002) ("upholding constitutional rights surely serves the public interest").

Where Plaintiffs show both the likelihood of success on the merits and irreparable harm, indisputably "the balance of equities and public interest tip in favor of Plaintiffs." *Los Padres Forestwatch v. U.S. Forest Service,* 776 F. Supp. 2d 1042, 1052 (N.D. Cal. 2011). The balance depends on the potential harm to each side. *Allen v. City of Lake*, 71 F. Supp. 3d 1044, 1056–57 (N.D. Cal. 2014). The more permanent Plaintiffs' harm if the requested relief is not granted and the more temporary Defendant's harm if it does, the greater the balance tips toward Plaintiffs. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). The balancing of harms here has already been made by the Court in *Martin* and *Jones*.


Dated: November 26, 2018                  Respectfully Submitted,

                                          HADSELL STORMER & RENICK LLP

                                          By: _____/s/ - Joshua Piovia-Scott_____
                                                Joshua Piovia-Scott