| | |
|---|---|
| 1 | DAN SIEGEL, SBN 56400 |
| 2 | EMILYROSE JOHNS, SBN 294319 |
|   | SIEGEL, YEE, BRUNNER & MEHTA |
| 3 | 475 14th Street, Suite 500 |
|   | Oakland, California 94612 |
| 4 | Telephone: (510) 839-1200 |
| 5 | Facsimile: (510) 444-6698 |
|   | Email: danmsiegel@gmail.com; emilyrose@siegelyee.com |

JOSHUA PIOVIA-SCOTT, SBN 222364
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Email: jps@hadsellstormer.com

Attorneys for Plaintiffs
ANITA MIRALLE, JODII LE'GRAND EVERETT, I,
TINA SCOTT, AIYAHNNA JOHNSON,
IRVIN JOSUE HERNANDEZ ORTEGA
and AYAT JALAL

**UNITED STATED DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANITA MIRALLE, JODII LE'GRAND EVERETT, I, TINA SCOTT, AIYAHNNA JOHNSON; IRVIN JOSUE HERNANDEZ ORTEGA; and AYAT JALAL, | Case No. 4:18-cv-06823-HSG |
| | **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Plaintiffs, | Hon. Haywood S. Gilliam, Jr. |
| vs. | |
| CITY OF OAKLAND, a subdivision of the State of California; LIBBY SCHAAF; JOE DEVRIES; ANNE KIRKPATRICK; and SABRINA LANDRETH, | |
| Defendants. | |

*Miralle v. City of Oakland,* Case no. 4:18-cv-06823-HSG
First Amended Complaint- 1

# INTRODUCTION

1. Oakland is experiencing unprecedented homelessness and a lack of adequate shelter for its homeless residents. In 2017, the City of Oakland formally acknowledged that it is home to over 2,700 homeless individuals. This represented a 25% increase from the number of people experiencing homelessness in 2015. The City reported that in 2018, it expected that number of people experiencing homelessness to increase three-fold.

2. In September 2017, acknowledging its failures to provide adequate shelter to those experiencing homeless and acknowledging the dangers inherent with living on the streets, the Oakland City Council declared a shelter crisis allowing it to suspend certain state and local health and safety regulations to provide unconventional shelter options to homeless residents. In its declaration, the City acknowledged that "the current number of homeless individuals in Oakland far outpaces the number of existing shelter beds, transitional housing or permanent supportive housing units available." It admitted that "a significant number of persons are without the ability to obtain shelter, and that the situation has resulted in a threat to the health and safety of those persons. . . . [T]his shelter crisis affects Oakland's citizens disproportionately with more African American, Latino and elderly individuals experiencing homelessness." It determined that "the long term and recent decreases in Federal and State funding for housing programs has resulted in an erosion of shelter options for the most vulnerable populations including the elderly, youth, victims of domestic violence, sexually exploited minors and persons suffering from mental illness, HIV/AIDS, substance abuse and disabilities." The City also declared that "analysis and evidence has demonstrated that providing decent, safe and stable housing combined with crucial support services are two primary components of successful transition from homelessness to a safer and healthier way of living."

3. Despite the City's declaration and statistics that show that Oakland's homeless population grew by 700 people between 2015 and 2017, and despite the City's

*Miralle v. City of Oakland,* Case no. 4:18-cv-06823-HSG
First Amended Complaint- 2

belief that its homeless population grew by 2,300 to 5,000 in 2018 alone, the City has only increased its emergency shelter beds by 360, its traditional shelter beds by 100 beds and its transitional housing beds (the only beds where a transition to permanent housing is contemplated) by 90 since 2017. The increase in shelter beds as compared to the astronomical growth of the homeless population in Oakland was so deeply inadequate that in February 2019, City Council President Rebecca Kaplan proposed declaring a state of local emergency under California Government Code section 8630 with regards to the City's homelessness crisis.

4. These conditions are so stark that a United Nations Special Rapporteur visited Oakland and remarked that "[a]ttempting to discourage residents from remaining in informal settlements or encampments by denying access to water, sanitation and health services and other basic necessities, as has been witnessed by the Special Rapporteur in San Francisco and Oakland, California, United States of America, constitutes cruel and inhuman treatment and is a violation of multiple human rights, including the rights to life, housing, health and water and sanitation."

5. The City's response has not been to provide these basic needs. Rather, it responds to human rights violations it creates by performing sweeps designed to force homeless residents to move under threat of arrest and to confiscate and dispose of their property. The City created an Encampment Management Policy that instructs the City to perform sweeps on homeless encampments if they are close to schools, senior centers, and other "community resources" to which the City apparently concludes homeless residents are not entitled.

6. During these operations, the City will take and destroy the property of residents or force property abandonment through threat of arrest. As a result, homeless residents are stripped of critical property necessary for safety and survival and of precious belongings. The operations often force homeless residents into unfamiliar areas with less protection from the elements and from those who wish to prey on their vulnerability, less property, and less stability. The City regularly fails to offer the

*Miralle v. City of Oakland,* Case no. 4:18-cv-06823-HSG
First Amended Complaint- 3

1  homeless residents it has forcibly removed from their encampment communities
2  options for alternative shelter. The experience often causes homeless residents
3  depression, fear, anxiety and stress.

4      7.    It was with this backdrop that plaintiffs, homeless women and men,
5  attempted to establish an encampment focused on security for women and families,
6  sobriety, and creating resources for the unhoused community. Plaintiffs, like many
7  homeless residents in Oakland, experienced the destruction of their encampment, the
8  seizure and destruction of their property, and their casting out into unfamiliar streets
9  when the City chose to eliminate their encampment.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (claims arising under the U.S. Constitution) and § 1343(a)(3) (claims brought to address deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution), and 42 U.S.C. § 1983.

9. Venue is proper in the United State District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because the defendants are located in the Northern District of California and § 1391(b)(2) because all of the acts and/or omissions complained of herein occurred within the Northern District of California.

## PARTIES

### Plaintiffs

10. At all times relevant hereto, plaintiff ANITA MIRALLE, was a homeless resident of Oakland, California and a resident of the Housing and Dignity Village at Edes Avenue and S. Elmhurst Avenue. Ms. Miralle lives with her two daughters, one of whom is a minor, in a camper. She runs a catering and vendor business and regularly works late into the night. Her minor child is a student who receives high school credit for classes she takes at Berkeley City College.

11. At all times relevant hereto, plaintiff JODII LE'GRAND EVERETT, I, was a homeless resident of Oakland, California and a resident of the Housing and Dignity Village at Edes Avenue and S. Elmhurst Avenue.

12. At all times relevant hereto, plaintiff TINA SCOTT, was a homeless resident of Oakland, California and a resident of the Housing and Dignity Village at Edes Avenue and S. Elmhurst Avenue.

13. At all times relevant hereto, plaintiff AIYAHNNA JOHNSON, was a homeless resident of Oakland, California and a resident of the Housing and Dignity Village at Edes Avenue and S. Elmhurst Avenue. Ms. Johnson worked odd jobs and occasionally worked nights. Ms. Johnson lives at times in a tent and at times in a vehicle with her two minor children. Her minor children were students attending school in the Oakland Unified School District.

14. At all times relevant hereto, plaintiff IRVIN JOSUE HERNANDEZ ORTEGA, was a homeless resident of Oakland, California and a resident of the Housing and Dignity Village at Edes Avenue and S. Elmhurst Avenue. Mr. Hernandez frequently worked late shifts. He lives at times in a tent and at times in a vehicle with his mother, who struggles with addiction and who has been the victim of sexual assault on several occasions while living as a homeless resident in Oakland.

15. At all times relevant hereto, plaintiff AYAT JALAL was a homeless resident of Oakland, California and a resident of the Housing and Dignity Village at Edes Avenue and S. Elmhurst Avenue. Mr. Jalal lives at times in a tent and at times in a makeshift structure. Mr. Jalal works in Ecology at Green Mary, which provides trash, compost and recycling services during special events.

**Defendants**

16. At all times relevant hereto, defendant LIBBY SCHAAF was the Mayor of the City of Oakland and she was acting within the course and scope of that employment. As Mayor of the City of Oakland, defendant SCHAFF is a policy-making official for Defendant CITY OF OAKLAND with the power to make official and final policy for the

*Miralle v. City of Oakland,* Case no. 4:18-cv-06823-HSG
First Amended Complaint- 5

CITY. Defendant SCHAAF is being sued in her individual and official capacities.

17. At all times relevant hereto, defendant JOE DEVRIES was the Assistant to the City Administrator of City of Oakland responsible for policies regarding homelessness and he was acting within the course and scope of that employment. As Assistant to the City Administrator, defendant DEVRIES is in charge of certain homelessness working groups. He is a policy-making official for defendant CITY OF OAKLAND with the power to make official and final policy for the CITY. Defendant DEVRIES is being sued in his individual and official capacities.

18. At all times relevant hereto, defendant ANNE KIRKPATRICK was the Police Chief of the CITY OF OAKLAND responsible for all policies and operations of the Oakland Police Department, including those with respect to the homeless, and she was acting within the course and scope of that employment. As Police Chief, she is a policy-making official for defendant CITY OF OAKLAND with the power to make official and final policy for the CITY. Defendant KIRKPATRICK is being sued in her individual and official capacities.

19. At all times relevant hereto, defendant SABRINA LANDRETH was the City Administrator of the CITY OF OAKLAND with final decision making power on all homeless encampment closures, and she was acting within the course and scope of that employment. As City Administrator, defendant LANDRETH is a policy-making official for defendant CITY OF OAKLAND with the power to make official and final policy for the CITY. Defendant LANDRETH is being sued in her individual and official capacities.

20. At all times relevant hereto, defendant CITY OF OAKLAND was a municipal corporation, duly organized and existing under the laws of the State of California. Under its authority, defendant CITY OF OAKLAND operates the Oakland Police Department and employs its officers and the Oakland Department of Public Works and employs its city workers.

///

# FACTUAL ALLEGATIONS

21. Plaintiff Anita Miralle is a homeless activist who advocates to defendants for the rights of the homeless, including the rights of the homeless to build intentional communities and to be self-determining and self-sufficient. Ms. Miralle lived in Oakland prior to becoming homeless and she has been homeless for a little over a year, when her landlord doubled her rent.

22. Beginning on October 27, 2018, Ms. Miralle, plaintiffs, and other homeless women and men moved to an unused lot at the corner of Edes Avenue and S. Elmhurst Avenue in East Oakland.

23. The lot was owned by the City and had been unused for a decade. Plaintiffs and other residents cleaned the land, which had been used for years for illegal dumping.

24. Prior to living on the lot, all plaintiffs were living in tents, campers, recreational vehicles, and/or vehicles throughout the City of Oakland by necessity and had no other way to shelter themselves.

25. Plaintiffs formed the encampment as an intentional, sober community that was safe for women and their families. Plaintiffs collected clothing, bedding, tents, and other necessary survival items that they distributed to anyone in need. They also cooked communal breakfasts and dinners four days a week to share with those in need. They held interfaith religious services. They had a health clinic where professionals provided free basic medical service to members of the Housing and Dignity Village and the surrounding neighborhood community.

26. On November 7, 2018, the City notified the encampment that it would forcibly remove their encampment. On its notice, the City included two phone numbers that residents could call to get information about the closure. However, one phone number was out of service and the other led only to a voicemail that was frequently full. Plaintiffs tried to call the numbers but they were not able to get a hold of a person.

*Miralle v. City of Oakland,* Case no. 4:18-cv-06823-HSG
First Amended Complaint- 7

27. The City performs two types of enforcement actions against encampments: a "clean and clear" and a "closure." During a "clean and clear," the Department of Public Works and the Police come to an encampment and "clean up" and clear items and debris, but residents of the encampment are permitted to remain in or near the location after they have vacated the location for the duration of the "clean up." During a "closure," the Department of Public Works and the Police destroy the encampment and force its residents to move.

28. During these operations, the City takes and destroys residents' property and forces residents to move from the encampment location. The City does not provide the encampment residents who are being forcibly evicted with an alternative shelter option. As there is not enough shelter in the City for all of its homeless residents, the City does not and cannot offer shelter to all residents of an encampment during a closure.

29. As part of these enforcement actions, the City often takes property when it is momentarily unattended with no investigation into its ownership. The City provides arbitrary lengths of time for residents to move their belongings, and they take and destroy its residents' personal property that that is not removed by that deadline, whether or not the owner is still present.

30. It is the natural and predictable consequence of the City's actions that homeless residents with no means to move their property, nowhere to move, and no City assistance are forced to leave behind belongings they desire to keep and that are integral to their lives and their efforts to get off the streets. Instead of storing them for residents or moving their items to a new safe location for the encampment, the City disposes of homeless residents' belongings.

31. At any enforcement action, City of Oakland police threaten arrest and/or citation if the residents do not comply, and can and do cite and arrest people.

32. Plaintiffs are familiar with these practices because they have witnessed

them and experienced them. For example, in February 2017, the City used a bulldozer, two dump trucks and approximately 80 police officers in full riot gear to destroy a similar encampment community in Marcus Garvey Park at 36th street and Martin Luther King Jr. Way in Oakland. Plaintiff Ms. Miralle lost belongings when the City destroyed that encampment. In addition to her own experiences, she has witnessed more than 40 of the City's operations since 2016. Plaintiff Mr. Hernandez had his property and shelter destroyed by the City on several occasions.

33. After plaintiffs were unsuccessful in challenging the City's plans in court, the City posted notice at the encampment stating that it would return December 5, 2018, to enforce a closure.

34. At around 8 a.m. on December 5, 2018, Oakland Police and Department of Public Works arrived to close the encampment and evict the residents. There was a significant amount of media and approximately a hundred supporters of the plaintiffs present at the encampment.

35. Plaintiffs had not moved because they did not have anywhere to go, but informed City officials that they were interested in any accessible shelter options that the City could provide for them.

36. The defendants failed to offer the plaintiffs accessible and/or adequate shelter options. For example, adult plaintiffs who were not living with minor children were told they could stay a night in the St. Vincent de Paul Shelter. The shelter operates only during the evening, allows a person to bring only two bags of belongings with her, does not allow residents to bring pets, and does not guarantee a resident more than a single night's stay.

37. Plaintiffs Ms. Scott, Mr. Everett, Mr. Hernandez, and Mr. Jalal were single adults not living with children. They would have been forced to abandon most of their belongings before entering the shelter for the night. Mr. Jalal would have had to abandon his dog to stay in the shelter. Mr. Hernandez often worked late nights and

would have been forced to quit his job. Further, plaintiffs were not guaranteed any long term stay or temporary or permanent housing option following their stay.

38. The adult plaintiffs living with their children were informed that they could stay at the only family shelter Oakland provides, which is in the City of Alameda.

39. Plaintiffs Ms. Miralle and Ms. Johnson were adults living with their minor children. They too would have to abandon the majority of their property and navigate the logistics of getting their minor children to their Oakland and Berkeley schools in the morning and the logistics of getting themselves to their jobs to stay a night in the shelter. Ms. Miralle would have also been forced to abandon her cats, as the shelter does not accommodate pets.

40. In order to get into the family shelter, the City informed plaintiffs, the City would have to move them to the front of a waiting list, displacing other Oakland families who were waiting for a spot in that shelter.

41. The plaintiffs asked for written information on the shelters, including the addresses and any restrictions or limitations, but the City would not provide this information.

42. Throughout the morning of December 5, plaintiffs and their advocates negotiated in good faith with representatives of the City of Oakland to stay in the site, address the situation without destroying the Housing and Dignity Village and/or place the plaintiffs in appropriate shelters. The City of Oakland eventually agreed to allow plaintiffs to stay pending a community meeting facilitated by Candice Elder of the East Oakland Collective and Margaretta Lin from the Dellums Institute for Social Justice.

43. Representatives from the City and Council Member Larry Reid's office, including Assistant City Administrator Marakeshia Smith and Councilmember Reid assistant Ray Leon, explicitly agreed to refrain from evicting the plaintiffs or clearing the encampment until this meeting was held. Plaintiffs were relieved and looked forward to negotiating with the City to resolve the situation.

44. However, the next day, December 6, 2018, without notice or warning, approximately 28 police officers and a dozen Department of Public Works employees came to clear the encampment.

45. Many residents were not present. Plaintiff Mr. Hernandez was at work. Plaintiffs Ms. Miralle, Ms. Johnson, Mr. Everett, and Mr. Jalal were the only plaintiffs present.

46. Plaintiffs who were present at this time asked the City officials for more time to pack and remove their belongings, and to allow the residents who were not there at that time the opportunity to do so, but the City officials refused. As a result, plaintiffs and other residents did not have the opportunity to pack or preserve their belongings.

47. Department of Public Works workers tore down shelters and structures, and failed to store property that plaintiffs specifically requested be stored. The city workers did not appear to be placing in bags or labeling anything they were taking. The plaintiffs and residents who were present at the time frantically tried to salvage their most important and valuable personal belongings, as well as for those who were not present, but City employees threw plaintiffs' possessions in the back of flatbed trucks and trash compactors, breaking and destroying many of plaintiffs possessions as they cleared the community. Police officers formed a line to prevent plaintiffs, residents and supporters from helping to gather the remaining property. Defendants filled multiple flatbed trucks with plaintiffs' property and removed it from the site. Finally, police handcuffed and forcibly removed the last four remaining people and destroyed the encampment.

48. Plaintiffs have been homeless since the eviction and defendants have made no efforts to help them find a shelter bed after December 5. They have been forced to live without their property.

49. Plaintiffs Ms. Johnson, Ms. Miralle, Mr. Hernandez, Mr. Everett, and Mr.

Jalal each tried multiple times to contact the City officials responsible for giving them access to any of their property that the City may have stored. They always got a voicemail and did not receive a return phone call after leaving a message.

50. Plaintiff Ms. Johnson repeatedly called all of the numbers provided by the City in an attempt to get her property back. No one answered any of these calls and she was forced to leave messages about her property, which she repeatedly did. She did not receive any calls back. On the day of the eviction, Ms. Johnson heard they were taking her property to 5050 Coliseum Way in Oakland. After Christmas, she went to 5050 Coliseum Way, but it was closed. In January 2019, she was given another number for Public Works, which was not listed on the eviction notice. She called that number and left a message. On January 23, 2019, she received a call from Leland Moore from Public Works. On January 24, 2019, Ms. Johnson sent Mr. Moore an email asking him when she and the other plaintiffs could come and get their property, and offered to organize a time that would work for all of the plaintiffs. She did not receive an email back.

51. Plaintiff Ms. Miralle repeatedly contacted City officials about her property in December 2018.  On January 11, 2019, she called and got through to a person at Public Works who connected her to another person at Public Works, who connected her to two other Public Works employees that they said she needed to talk to in order to retrieve any of her stored property. She left messages for both but never heard back. On or about January 27, 2019, Ms. Miralle spoke with Peter Dunlap from Public Works, who told her that each resident needed to produce an itemized list with specific details about each item she was "claiming" the City took. On February 6, 2019, Ms. Miralle emailed Mr. Dunlap a four page, detailed list of the property taken by the City as requested. Ms. Miralle did not hear back from Mr. Dunlap.

52. On March 1, 2019, three months after the City cleared plaintiffs from their encampment community and took their property, plaintiffs' counsel wrote an email to City Attorney Jamilah Jefferson and informed her that the plaintiffs and residents had

made numerous attempts to retrieve their property since it was taken on December 6 but had not been able to get any of their property back. Plaintiffs' counsel requested that City Attorney Jefferson help ensure that plaintiffs could get their property back.

53. On March 5, City Attorney Jefferson responded to plaintiffs' counsel's email and informed them that the City "is currently undergoing the process of reviewing" plaintiffs' property. The City provided a list of plaintiffs' items that the City said it still had in its possession, but this list omitted many of the items that plaintiffs desired to retrieve and which should have been collected and maintained pursuant to City policy. The list itself states that many of the items on the inventory presented by plaintiffs "were not present." The omission of these items indicates that they were either destroyed or otherwise not stored.

54. For example, the City did not report having stored plaintiff Ms. Miralle's catering equipment that she uses for personal and business purposes, Mr. Jalal's work clothing and poetry and personal writings stored in notebooks and journals, and Ms. Johnson's religious materials.

55. On March 29, 2019, Ms. Miralle emailed Mr. Leland to set up a time for plaintiffs to view the condition of and retrieve the property that was said to be stored.

56. Mr. Leland responded by email and told Ms. Miralle that he would contact her "on Monday 04/01/09 to arrange a date and time." When he failed to do so, Ms. Miralle emailed him again on April 3, 2019, after which he told her he was attempting to set it up for April 8, 2019. However, plaintiffs still have not been able to view or retrieve their belongings that were reportedly stored.

57. Plaintiffs cannot confirm that the City indeed stored anything it claims to have because the City has denied plaintiffs any meaningful process for them to secure the return of their property.

58. After the City closed the Housing and Dignity Village, plaintiffs were forced back into the streets without tents, bedding, clothing and other necessary

property and sentimental belongings. Ms. Miralle has trouble sleeping through the night because of the constant disruption from predators and/or police telling her she has to move from where she is parked. Two of the women residents relapsed because of the stress of the eviction and of returning to the streets. One resident was raped three weeks after Housing and Dignity Village was closed.

59. Plaintiffs remain homeless and as such they are subject at any time to the City's practices during homeless encampment sweeps.

**FIRST CLAIM FOR RELIEF -**
**DENIAL OF DUE PROCESS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS**
(By plaintiffs against all defendants.)
(42 U.S.C. § 1983)

60. Plaintiffs incorporate by reference paragraphs 1 through 59 above as though fully set forth herein.

61. By virtue of the foregoing, defendant fails to provide adequate notice before taking actions against plaintiffs that outright destroy or otherwise fail to preserve their property thereby denying them any meaningful opportunity for the return of their property, depriving plaintiffs their right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from the seizure of property without due process.

62. As a direct and proximate consequence of the acts of defendants and their agents and employees, plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

**SECOND CLAIM FOR RELIEF -**
**UNLAWFUL SEIZURE IN OF PROPERTY IN VIOLATION OF THE FOURTH AMENDMENT**
(By plaintiffs against all defendants)
(42 U.S.C. § 1983)

63. Plaintiffs incorporate by reference paragraphs 1 through 62 above as though fully set forth herein.

64. Defendants violated plaintiffs' Fourth Amendment rights to be free from

unreasonable seizure of their property by confiscating and then destroying plaintiffs' property without sufficient warning and at times under threat of arrest if plaintiffs reentered the cordoned off encampment. Defendants' unlawful actions was done with the specific intent to deprive plaintiffs of their constitutional rights to be secure in their property or with reckless disregard of their rights.

65. Plaintiffs are informed and believe that the acts of the defendants and their employees and agents were intentional in failing to protect and preserve their property and that, at minimum, the defendants were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, based on the past circumstances of similar constitutional and statutory violations of the law.

66. As a direct and proximate consequence of the acts of defendants and their agents and employees, plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

**THIRD CLAIM FOR RELIEF –
VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE
FOURTEENTH AMENDMENT**
(By plaintiffs against all defendants.)
(42 U.S.C. § 1983)

67. Plaintiffs incorporate by reference paragraphs 1 through 66 above as though fully set forth herein.

68. Poverty, unemployment, untreated mental and physical illness, and the City's failure to provide adequate shelter space often force plaintiffs and other homeless individuals to sleep in public places, which the City admits is dangerous for homeless residents.

69. To protect themselves from harsh elements such as rain and cold, as well as to provide basic means of security and privacy, homeless residents use tents and construct shelters using materials purchased, donated and salvaged.

70. When the City performs homeless sweeps, it destroys or otherwise fails to preserve shelters for these homeless residents.

71. The City provides no alternative adequate shelter for the residents whose shelters they've destroyed, nor could it considering the number of homeless residents as compared to the number of shelter beds available in the City.

72. By doing so, defendants put plaintiffs in a more dangerous situation than they were in before the City intervened, in violation of the Fourteenth Amendment to the United States Constitution.

73. As a direct and proximate consequence of the acts of defendants and their agents and employees, plaintiffs have suffered and continue to suffer from the danger the City has put them in and are entitled to damages for injury to their person.

**FOURTH CLAIM FOR RELIEF –**
**CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT**
(By plaintiffs against all defendants.)
(42 U.S.C. § 1983)

74. Plaintiffs incorporate by reference paragraphs 1 through 73 above as though fully set forth herein.

75. Poverty, unemployment, untreated mental and physical illness, and the City's failure to provide adequate shelter space often force plaintiffs and other homeless individuals to sleep in public places.

76. Although plaintiffs are homeless and have no way to comply with California Penal Code section 647(e) or Oakland Municipal Codes preventing persons from sitting or lying because they must sleep outdoors, defendants and their agents have cited, arrested, or threatened plaintiffs for sleeping in public places in Oakland. Defendants are punishing plaintiffs and other homeless individuals based on their status as homeless persons.

77. Defendants' actions that penalize plaintiffs for their involuntary status constitute cruel and unusual punishment in violation of plaintiffs' well established rights under the Eighth Amendment of the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

*Miralle v. City of Oakland,* Case no. 4:18-cv-06823-HSG
First Amended Complaint- 16

78. Plaintiffs seek redress for defendants' violation of their right to be free from cruel and unusual punishment.

79. As a direct and proximate consequence of the acts of defendants and their agents and employees, plaintiffs have suffered and continue to suffer and are entitled to damages for injury to their person.

**FIFTH CLAIM FOR RELIEF -
RETALIATION AGAINST PROTECTED ACTIVITY IN VIOLATION
OF THE FIRST AMENDMENT**
(By plaintiffs against all defendants.)
(42 U.S.C. § 1983)

80. Plaintiffs incorporate by reference paragraphs 1 through 79 above as though fully set forth herein.

81. By virtue of the foregoing, defendants targeted plaintiffs for eviction in the dead of winter based on the content of their speech and their political engagement.

82. As a direct and proximate consequence of the acts of defendants and their agents and employees, plaintiffs have suffered and continue to suffer and are entitled to damages for injury to their person.

**SIXTH CLAIM FOR RELIEF -
SELECTIVE ENFORCEMENT IN VIOLATION
OF THE FOURTEENTH AMENDMENT**
(By plaintiffs against the defendants.)
(42 U.S.C. § 1983)

83. Plaintiffs incorporate by reference paragraphs 1 through 82 above as though fully set forth herein.

84. By virtue of the foregoing, defendants targeted plaintiffs for enforcement in the dead of winter based on the content of their speech and their political engagement while allowing other homeless residents who were not politically active remain in encampments.

85. As a direct and proximate consequence of the acts of defendants and their agents and employees, plaintiffs have suffered and continue to suffer and are entitled to damages for injury to their person.

///

**SEVENTH CLAIM FOR RELIEF -**
**DELIBERATE INDIFFERENCE TO VIOLATIONS OF CONSTITUTIONAL RIGHTS**
(By plaintiffs against the defendant CITY OF OAKLAND)
(42 U.S.C. § 1983)

86. Plaintiffs incorporate by reference paragraphs 1 through 85 above as though fully set forth herein.

87. Defendant CITY OF OAKLAND enforced policies and practices that it knew violated the constitutional rights of plaintiffs, as enumerated above, and deliberately disregarded its obligation to refrain from doing so.

88. By virtue of the foregoing, defendant CITY OF OAKLAND was deliberately indifferent to the obvious consequences of its policy and the practices of its employees. As a result, defendant CITY OF OAKLAND deprived plaintiffs of their rights, as set forth above.

89. As a direct and proximate consequence of the acts of defendant CITY OF OAKLAND and its agents and employees, plaintiffs have suffered and continue to suffer and are entitled to compensatory damages and damages for injury to their person.

Dated: April 19, 2019

SIEGEL, YEE, BRUNNER & MEHTA

By  /s/EmilyRose Johns
    EmilyRose Johns

Attorneys for Plaintiff
ANITA MIRALLE, JODII LE'GRAND EVERETT, I, TINA SCOTT, AIYAHNNA JOHNSON, IRVIN JOSUE HERNANDEZ ORTEGA, and AYAT JALAL