DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com;
emilyrose@siegelyee.com

THERESA ZHEN, SBN 300710
HADSELL STORMER RENICK & DAI LLP
128 N Fair Oaks Ave, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Email: tzhen@hadsellstormer.com

Attorneys for Plaintiffs
ANITA MIRALLE, JODII LE'GRAND EVERETT, I, TINA SCOTT, AIYAHNNA JOHNSON; IRVIN JOSUE HERNANDEZ ORTEGA; and AYAT JALAL

BARBARA J. PARKER
City Attorney, SBN 069722
MARIA BEE
Chief Assistant City Attorney, SBN 167716
DAVID A. PEREDA
Special Counsel, SBN 237982
JAMILAH A. JEFFERSON
Supervising Deputy City Attorney, SBN 219027
ZOE M. SAVITSKY
Supervising Deputy City Attorney, SBN 281616
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:  (510) 238-7686
Fax:  (510) 238-6500
Email:jjefferson@oaklandcityattorney.org
zsavitsky@oaklandcityattorney.org

Attorneys for Defendant,
CITY OF OAKLAND, et al.

# UNITED STATED DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANITA MIRALLE, JODII LE'GRAND EVERETT, I, TINA SCOTT, AIYAHNNA JOHNSON; IRVIN JOSUE HERNANDEZ ORTEGA; and AYAT JALAL,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF OAKLAND, a subdivision of the State of California; LIBBY SCHAAF; JOE DEVRIES; SUSAN MANHEIMER; and EDWARD REISKIN,<br><br>Defendants. | Case No. 4:18-cv-06823-HSG<br><br>**JOINT REQUEST FOR A CONTINUANCE OF MANDATORY SETTLEMENT CONFERENCE**<br><br>**Case Filed:** November 9, 2018<br><br>**Hon. Haywood S. Gilliam, Jr.** |

Plaintiffs Anita Miralle, Jodii Le'Grand Everett, I, Tina Scott, Aiyahnna Johnson, Irvin Josue Hernandez Ortega, and Ayat Jalal ("Plaintiffs") and the City of Oakland ("City") (collectively, "parties") submit the instant joint request for a continuance of the parties' mandatory settlement conference currently scheduled for December 17, 2020.

On October 21, 2020, the Oakland City Council adopted the 2020 Encampment Management Policy, attached hereto as Exhibit A. It dealt changes to the Encampment Management Policy that is at the heart of the parties' settlement discussions. While the parties were assessing their options to move forward with settlement discussions, the City Council scheduled another public meeting on December 15, 2020 to consider additional modifications to the policy. The parties anticipate that further changes will be made to the policy at that meeting. Due to these recent developments and the unsettled nature of the policy, the parties have been unable to meet and confer in a manner that will result in a productive settlement conference.

Because the policy that is at the heart of this case has been modified by the Oakland City Council and will likely be modified again this month, the parties seek to continue the settlement conference to a date in January 2021 or February 2021. The additional time is critical for the parties to assess their options for settlement and to provide adequate time to meet and confer.

Dated: December 8, 2020                HADSELL STORMER RENICK & DAI LLP


                                       By  /s/ Theresa Zhen
                                          Theresa Zhen
                                       Attorneys for Plaintiffs
                                       ANITA MIRALLE, JODII LE'GRAND
                                       EVERETT, I, TINA SCOTT,
                                       AIYAHNNA JOHNSON,
                                       IRVIN JOSUE HERNANDEZ ORTEGA,
                                       and AYAT JALAL

Dated: December 8, 2020                SIEGEL, YEE, BRUNNER & MEHTA

By /s/ EmilyRose Johns
EmilyRose Johns
Attorneys for Plaintiffs
ANITA MIRALLE, JODII LE'GRAND EVERETT, I, TINA SCOTT, AIYAHNNA JOHNSON, IRVIN JOSUE HERNANDEZ ORTEGA, and AYAT JALAL

Date: December 8, 2020

BARBARA J. PARKER, City Attorney
MARIA BEE, Chief Assistant City Attorney
DAVID A. PEREDA, Special Counsel
JAMILAH A. JEFFERSON, Sr. Dep. City Atty
ZOE M. SAVITSKY, Sr. Dep. City Atty

By:  /s/ Jamilah Jefferson
Jamilah Jefferson
Attorneys for Defendants,
CITY OF OAKLAND, et al.

Date: December 8, 2020

BARBARA J. PARKER, City Attorney
MARIA BEE, Chief Assistant City Attorney
DAVID A. PEREDA, Special Counsel
JAMILAH A. JEFFERSON, Sr. Dep. City Atty
ZOE M. SAVITSKY, Sr. Dep. City Atty

By:  /s/ Zoe Savitsky
Zoe Savitsky
Attorneys for Defendants,
CITY OF OAKLAND, et al.

Dated: December 10, 2020

IT IS SO ORDERED
Judge Joseph C. Spero

Ex. A

**2020 Encampment Management Policy**
**City of Oakland**

**I. INTRODUCTION**

In December 2019, the Oakland City Council adopted the Permanent Access to Housing (PATH) Framework, which among other things, recommended strategies and interventions to address the growing homelessness crisis in Oakland.

The PATH Framework groups response strategies into three major categories:

1. **Prevention:** to protect vulnerable tenants from losing the housing they have and stabilizing those most at risk of becoming homeless;
2. **Emergency Response:** to shelter and rehouse households and improve health and safety on the street.
3. **Housing Development:** to expand the number of Extremely Low Income (ELI) and Permanent Supportive Housing (PSH) units prioritized for individuals and families experiencing homelessness.

Prevention strategies and affordable housing development strategies are not addressed in this particular policy; however, it is important to acknowledge that the emergency response strategies outlined in this policy fall within a broader framework to ultimately exit unhoused individuals and families from the homelessness system to permanent housing.

The PATH Framework specifically called for the development of an Encampment Management Policy to address the adverse health and safety impacts of unsheltered homelessness, with compassion and care to not criminalize poverty. Additionally, the PATH Framework highlights the importance of developing an encampment policy through a race and equity lens, given the disproportionate impact of homelessness on African Americans in Oakland, as well as disproportionate health and safety impacts from encampments on low income communities of color.

**A. Equity Considerations**

African Americans are disproportionately impacted by unsheltered homelessness. In Oakland, 70 percent of the homeless population are African American and the vast majority of known encampments at this time are located within communities of concern. For these reasons, this policy was developed with an intentional focus on the following equity outcomes:

- Health and safety standards are achieved and maintained for encampment residents who are disproportionately Black, Indigenous, and Persons of Color (BIPOC)
- BIPOC neighborhoods and businesses are not disproportionately impacted by vehicle and street encampments
- Service provisions close disparities in BIPOC groups' representation in homelessness

An equity impact analysis will be conducted in coordination with the City's Department of Race and Equity after the adoption and implementation of this policy to ensure the stated outcomes above are achieved and maintained.

It is important to note that an equity impact analysis is a comprehensive process that begins during the policy development stage and extends well into the implementation and evaluation stage of the policy process.

**2020 Encampment Management Policy**
**City of Oakland**

To this end, this policy will undergo a semi-annual equity review to determine its effectiveness in relation to the equity indicators and outcomes consistent with the guidance and best practices promoted by the City's Department of Race and Equity.

### B. Public Safety Considerations

It is important to distinguish between public safety "emergencies" and public safety "factors" to determine the appropriate encampment intervention. **Public safety emergencies requiring a fire, medical, and/or police response should be immediately reported to 911, and those departments shall respond according to the ordinances, codes, statutes, and/or regulations under which they operate and are authorized to enforce (e.g. Health & Safety Code, Fire Code, Penal Code, etc.). The status of being unsheltered does not create immunity from generally enforced state codes and local ordinances.** For example, the investigation of crimes committed at encampments, especially violent crimes, arson, and narcotics trafficking, shall be conducted consistent with the laws and policies that currently govern all other criminal investigations, irrespective of location or whether the suspect is sheltered or unsheltered. Although the City does not enforce ordinances or policies that criminalize the "status" of being homeless (e.g. citing or arresting for sitting, lying, or sleeping outdoors), the City will enforce ordinances and policies aimed at punishing criminal conduct unrelated to the status of being homeless (e.g. drug and sex trafficking, arson, assault, vandalism, etc.). The City shall enforce against all criminal activities in encampments regardless of housing status.

Regarding public safety factors that are not necessarily public safety emergencies (e.g. accumulation of trash/debris, right-of-way obstructions, distancing of tents/vehicles/structures, etc.), the Encampment Management Team shall determine the level of intervention depending on specific findings, which are presented later in this policy.

### C. Encampment Management Team

The Encampment Management Team (EMT) is an interdepartmental working group tasked with implementing and administering this policy, consisting of representatives from Oakland's Public Works Department ("OPW"), Human Services Department ("HSD"), Oakland Police Department ("OPD"), Oakland Fire Department ("OFD"), the City Administrator's Office ("CAO"), and other consulted departments as necessary (e.g., the Mayor's Office, the City Attorney's Office, Parks and Recreation). The EMT is facilitated by the CAO via the Homelessness Administrator.

The division of responsibilities between each member department of the EMT may be adjusted as necessary depending on available resources, capacity, and emergency responsiveness. Each department may, from time to time, promulgate additional specific procedures necessary to effectuate the roles and duties described in this policy under department specific Standard Operating Procedures (SOPs). The CAO may also promulgate guidance to all EMT member departments that further defines each department's roles and responsibilities.

2

**2020 Encampment Management Policy**
**City of Oakland**

Each stakeholder department:

- Provides regular input on issues governed by this policy, based in their departmental expertise;
- Participates in collective decision-making for any intervention proposed under this policy;
- Performs any aspect(s) of an intervention delegated to their department once the intervention is approved by the EMT under this policy; and
- Participates as needed in developing procedure(s) to effectuate this policy.

The purpose of this policy is to protect and serve all Oaklanders, sheltered and unsheltered, and to manage the adverse impacts of homeless encampments by balancing the interests of all residents (i.e. unhoused, housed, business community), focusing encampment actions on mitigating negative outcomes as they pertain to public safety, public health, and equity outcomes. This policy aims to:

1. Designate high-sensitivity areas, where unmanaged encampments are presumed to cause unreasonably high levels of health and safety impacts due to the nature of the location;
2. Designate low-sensitivity areas, where enforcement will not be prioritized.
3. Determine findings that will prompt EMT intervention;
4. Provide guidance on addressing unreasonable health and safety risks, promoting voluntary compliance, and strategies to address non-compliance.

## II. DESIGNATION OF ENCAMPMENT SENSITIVITY AREAS

This policy designates two distinct areas – high and low sensitivity - with respect to presumed health and safety concerns related to vehicle and street encampments.

### A. High-Sensitivity Areas

High-Sensitivity Areas are formally designated by the City Council and can include parks, protected waterways, and other public lands. High-sensitivity areas are locations where the health and safety impacts of homeless encampments are heightened due to the potential degradation of critical infrastructure, restriction of public amenities or services, or significant obstructions to residences, businesses, emergency routes and rights-of-way. In these locations, the City would prioritize maintaining the areas free of encampments. The City Council reserves the right to allow encampments in high-sensitivity areas, however, it is recommended that the operation and management of encampments in these areas be in collaboration with a managing agency. The managing agency would work in collaboration with encampment residents and the City to mitigate safety and health hazards. The managing agency can be a nonprofit organization, advocacy group, faith-based organization, another public agency, or a grassroots collective. The managing agency must meet the City's insurance requirements (or obtain a fiscal sponsor that is able to meet the City's insurance requirements). Guidance on the implementation of this model can be found in Appendix A.

3

**2020 Encampment Management Policy**
**City of Oakland**

Adoption of this policy would establish the following public property locations as high-sensitivity areas:

- All vehicular traffic lanes, bike lanes, and sidewalks must comply with American Disabilities Act (ADA) sidewalk and street requirements and must allow for passage of emergency vehicles.
- Locations designated as High Fire Severity Zones (HFSZ) by the Oakland Fire Department and/or CalFIRE.
- Within 150 feet of a school.
- Within 50 feet of a protected waterway as established by any governing body.
- Within 50 feet of a residence or business.
- Within 50 feet of a playground or tot lot.
- Within 50 feet of a public park, soccer field, baseball field, basketball court, tennis court, and/or golf course.
- Areas directly adjacent (within 25 feet) to emergency shelter interventions.

**B. Low-Sensitivity Areas**

Low-Sensitivity Areas are all other areas not included above, and the following standards are to apply to all encampments in these locations:

- Shall be limited to one side of the street.
- Shall not impede vehicle, bike, or pedestrian traffic (on at least one side of the street)
- Shall not impede ADA access points.
- Shall not impede emergency ingress/egress routes.
- Compliance with applicable and generally enforced state codes and local ordinances.
- Encampment footprint shall not exceed 12 x 12 sq. ft per person.
- Area directly adjacent to a vehicle dwelling must remain clear at all times.
- No gray or black water dumping.
- No illegal electrical or water taps.
- No storage of tires, gasoline, generators, or propane tanks, or unsafe storage of combustible materials or accumulation of combustible waste.
- Structures, tents, and vehicle dwellings shall maintain not less than six (6) feet distance between one another.

Encampments in low-sensitivity areas are monitored and managed by the EMT (barring emergency situations that require a fire, medical, police, or other emergency response). In the case of a medical or public safety emergency, 911 should be called.

Encampments that do not comply with the standards outlined above as well as with applicable and generally enforced state codes and local ordinances are subject to EMT intervention, and inquiries and complaints should be forwarded to 311 and/or homelessness@oakalndca.gov for action.

**2020 Encampment Management Policy**
**City of Oakland**

## III. EMT INTERVENTION

### A. Findings Prompting EMT Intervention

Encampments located in high-sensitivity areas are always subject to EMT intervention (except for exceptions approved by the City Council) given the potential degradation of critical infrastructure, restriction of public amenities or services, or significant obstructions to residences, businesses, emergency routes and rights-of-way.

For encampments located in low-priority areas that do not meet the standards outlined above, the EMT will consider the following findings in deciding what level of intervention is appropriate.

*Public health findings:*
- Confirmed case(s) of infectious disease(s) (e.g., Bubonic plague, Tuberculosis, Zika, COVID-19);
- Confirmed exposure(s) to case(s) of infectious disease(s) (e.g., Bubonic plague, Tuberculosis, Zika, COVID-19);
- Excessive animal or vermin vector hazards (e.g., rats, other vector vermin);
- Presence of biological vector hazards (e.g., blood, fecal matter);
- Notice of public health emergency at an encampment site declared by a county, state, or federal public health entity;
- Need for encampment decompression as identified by public health officials; and/or
- Location of encampment in a public recreational area, or shared facility for recreational activity should such facility require repurposing, pursuant to the Order of the Alameda County Health Officer to Shelter in Place No. 20-04 or other similar subsequent orders.

*Public safety findings:*
- Location of encampment impedes the right-of-way, lane of traffic, bike lane, or ADA access;
- Location of encampment such that First Responders (including, but not limited to, Fire, Police, and any health care workers), are impeded in performing their essential government functions;
- Pervasive criminal activity;
- Damage to essential infrastructure (e.g., reservoirs, bridges, public utilities, drainage and sewer systems);
- Excessive amounts of waste/garbage/debris as determined by OPW.
- Proximity of encampment to objective dangers (e.g., edge of a steep slope, on an in-use train track, in a vehicular lane of traffic).
- Excessive fire hazards and/or calls for service as determined by OFD.
- Unpermitted outside fires burning less than 30 feet away from any structure, tent, or vehicle.
- Presence of open electrical splices or illegal wiring.
- Roadway does not have 20' unobstructed width for Fire Apparatus Access
- Fire hydrant obstructions with less than three (3) feet radial clearance around hydrants.
- Storage of tires, gasoline, or propane tanks, and unsafe storage of combustible materials or accumulation of combustible waste.

**2020 Encampment Management Policy**
**City of Oakland**

**The City will not cite or arrest any individual solely for camping, or otherwise for the status of being homeless, and will make reasonable efforts to allow and, where feasible, assist the encamped individual with gaining compliance with the encampment standards outlined in this policy.**

**B. Types of EMT Interventions**

- **Health & Hygiene Intervention**. This intervention may include placing handwashing stations, portable toilets, mobile shower facilities, providing routine waste collection services, and/or outreach services at an encampment. This intervention may be used at as many encampments as the City can reasonably serve given its resources. When possible, this intervention will be coordinated with partner public agencies. The EMT will use the 2018 Minimum Health and Safety Standards to determine which encampments are eligible for this intervention.

- **Deep Cleaning.** This intervention may require individuals encamped at a site to temporarily relocate to mitigate public safety and/or public health risks, allowing individuals to return to the site after the intervention is complete. This intervention may be used when one or more of the public safety and/or public health findings identified above are present and, due to its presence, the EMT decides that performing this intervention is necessary to protect the public. In performing this intervention, the City will make reasonable efforts to mitigate any individual or group property loss, as outlined in OPW's SOPs, but may determine that some property must be removed to protect the public. When possible, this intervention will be coordinated with relevant public agencies.

- **Partial closure.** This intervention may include partially moving and/or closing an encampment due to construction, to provide access to a work zone, or to abate ongoing public safety and/or health hazards. Affected encamped individuals will be offered shelter and/or alternative housing (or, if located in a high-sensitivity area, an opportunity to voluntarily relocate to a low-sensitivity area). This intervention may be used when the City is alerted to an impending construction or work project, and/or one or more of the public safety and/or public health findings identified above are present and, due to its presence, the EMT decides that performing this intervention is necessary to protect the public (including, but not limited to, the health and/or safety of the individuals living in the encampment). In performing this intervention, the City will make reasonable efforts to mitigate any individual or group property loss, as outlined in OPW's SOPs, but may determine that some property must be removed to protect the public. Additionally, the City, on its own or in conjunction with another public agency, will make offers to all affected encamped individuals of shelter and/or alternative housing.

- **Closure.** This intervention may include fully closing an encampment due to construction, to provide access to a work zone, or to abate ongoing public safety and/or health hazards. Affected encamped individuals will be offered shelter and/or alternative housing (or, if located in a high sensitivity zone, an opportunity to voluntarily relocate to a low sensitivity zone). This intervention may be used when the City is alerted to an impending construction or work project, and/or one or more of the public health and/or public safety findings identified above are present and, due to its presence, the EMT decides that performing this intervention is necessary to protect the public (including, but not limited to, the health and/or safety of the individuals living in the encampment). In performing this intervention,

6

**2020 Encampment Management Policy**
**City of Oakland**

the City will make reasonable efforts to mitigate any individual or group property loss, as outlined by OPW's SOPs, but may determine that some property must be removed to protect the public and/or to complete the process of closing the encampment. Additionally, the City, on its own or in conjunction with another public agency, will make offers to all affected encamped individuals of shelter and/or alternative housing.

**C. Public Noticing of EMT Interventions**

To the extent feasible, the City will follow the procedures stated below to provide notice prior to any encampment intervention.

*Non-emergency Actions*

For any non-urgent intervention, the City will provide adequate notice. For Health & Hygiene interventions, the City will work with those encamped to ensure the effectiveness of the intervention. For all Deep Cleaning, Partial Closure, and Closure interventions, the City will provide at least a 72-hour notice unless there is an emergency that prevents such notice from being provided, as described in the section below. The 72-hour notice will be provided in writing, posted around the site in multiple languages, and, as feasible, verbally to those encamped.

*Emergency Actions Due To Catastrophic Events, Natural Disasters, or other Urgent Health and Safety Concerns*

For any emergency Deep Cleaning, Partial Closure, or Closure, the City will make reasonable efforts to provide those encamped with some form of notice, such as outreach workers visiting the site and sharing information verbally or in writing, if such notice is feasible. For certain public health or public safety interventions, like fires, the City may be unable to provide prior notice due to the nature of the emergency.

**D. Storage of Individuals' Property**

In performing any intervention, the City will respect and protect individuals' rights to their property while also following applicable local, state, and federal laws.

During the course of any EMT intervention, OPW and other EMT member departments may remove debris, trash, waste, illegal dumping, hazmat, and/or other materials, following ordinary procedures with respect to handling such materials and the disposal thereof. OPW and other EMT member departments may also encounter property that is not debris, trash, waste, illegal dumping, or hazmat. For any such property: (1) whose ownership cannot be clearly determined but does not seem abandoned; or (2) whose ownership is known but the owner cannot transport it, the City will make reasonable efforts to store up to one (1) square yard of such property per individual. Any such effort will comport with OPW's ordinary practices with respect to property storage during encampment interventions. Should OPW require additional procedures for performing these property-related functions under this policy, OPW may promulgate such additional SOPs. Note that if a law enforcement agency must effectuate an arrest, the Alameda County Sheriff's Department, which operates the County's detention and incarceration facilities, will set any and all rules regarding property storage at their facilities.

7

**2020 Encampment Management Policy**
**City of Oakland**

While this policy is in effect, the EMT will explore reasonable methods of safe, secure, property storage potentially available to the City, including, but not limited to, OPW's storage facility; self-storage; and partnering with other public agencies or businesses to develop storage capacity.

**IV. COMPLIANCE**

The City must balance the rights of encamped individuals against its fundamental duty to maintain public safety and public health, in both high- and low-sensitivity areas. Where necessary, and when voluntary compliance cannot be achieved, the EMT may perform one of the four (4) interventions described above to maintain public safety and public health. The City will not cite or arrest solely for camping, but will enforce criminal laws in an ordinary manner to protect unsheltered and sheltered residents alike.

Encampments located within a high-sensitivity area that are not approved by the City Council will be subject to a Closure intervention as outlined above. Except when urgent health and safety concerns require shorter notice, encampment residents will be given 72-hours to accept an offer of shelter or alternative housing if such referrals are available. A person is also free to voluntarily relocate to a low-sensitivity area if shelter provisions are declined. All declinations will be documented. Emergency shelter provisions cannot be reserved for greater than 72-hours at a time, given the current demand.

Encampments in low-sensitivity areas that are in compliance with the standards outlined above are not subject to EMT intervention, unless an emergency arises. Outreach efforts and service offers will continue, as resources allow, with the goal of ending the individual's unsheltered status. Encampments in compliance with the standards established for low-sensitivity areas must still abide by all relevant and generally enforced local, state and federal laws.

Encampments in low-sensitivity areas that are not in compliance with the standards established in this policy are subject to EMT intervention as follows:

- Encampment residents will be notified by the EMT of any public safety and/or public health findings and, unless urgent health and safety concerns require shorter notice, will be given 72-hours to obtain voluntary compliance. Outreach workers may assist encampment residents during this period to achieve voluntary compliance.
- If the Outreach Team is unsuccessful, the encounter is documented and scheduled for a Deep Cleaning, Partial Closure, or Closure as determined by specific findings of the EMT, adhering to all noticing and storage requirements outlined above.

The City cannot require any individual to accept any offered form of shelter and/or alternative housing, even if such acceptance is strongly recommended for public health or public safety reasons. Instead, an individual offered shelter and/or alternative housing who declines the offer may continue to camp without risk of being issued a citation or arrested for remaining encamped, unless the encampment must be partially or fully closed as described above for public health and/or public safety reasons. In those limited circumstances, the City will not cite or arrest any individual solely for camping, or otherwise for the status of being homeless, and will make reasonable efforts to allow and, where feasible, assist the encamped individual in moving to a new location, and will avoid citation or arrest unless either is necessary to protect against imminent risks to public safety and alternative indoor shelter or housing has been offered and declined.

8

2987429v1